# In the United States Court of Federal Claims

No. 17-970C
Filed: July 13, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | * |
| | * |
| | * |
| ALTAIR GLOBAL CREDIT OPPORTUNITIES | * |
| FUND (A), LLC, ANDALUSIAN GLOBAL | * |
| DESIGNATED ACTIVITY COMPANY, | * |
| GLENDON OPPORTUNITIES FUND, L.P., | * |
| MASON CAPITAL MASTER FUND LP, | * |
| NOKOTA CAPITAL MASTER FUND, L.P., | * |
| OAKTREE-FORREST MULTI-STRATEGY, LLC | * |
| (SERIES B), OAKTREE OPPORTUNITIES | * |
| FUND IX, L.P., OAKTREE OPPORTUNITIES | * |
| FUND IX (PARALLEL 2), L.P., OAKTREE | * |
| VALUE OPPORTUNITIES FUND, L.P., OCHER | * |
| ROSE, L.L.C., and SV CREDIT, L.P., | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |
| | * |

U.S. Const. art. IV, § 3; amend. V, Takings Clause; 28 U.S.C. § 1491 (Tucker Act); 48 U.S.C. §§ 2101–2241 (2012 & Supp. IV 2017) (Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA")); Jones-Shafroth Act, Pub. L. No. 64-368, 39 Stat. 951 (1917), codified as amended at 48 U.S.C. §§ 731–751; Small Business Job Protection Act, Pub. L. No. 104-188, 110 Stat. 1755 (1996); H.R.J. 124, Pub. L. No. 87-121, 75 Stat. 245 (1961) (imposing a debt limit on Puerto Rico); P.R. Const. art. VI, §§ 2, 8; Employees Retirement System Enabling Act, P.R. Laws Ann. tit. 3, §§ 761–788 ("Act 447"); Urgent Interest Fund Act, 2006 P.R. Laws 91; Joint Resolution For Other Allocations For Fiscal Year 2017-2018 ("Joint Resolution 188"); Law To Guarantee Payment To Our Pensioners And Establish A New Plan For Defined Contributions For Public Servants ("Act 106-2017"); Rule of the United States Court of Federal Claims ("RCFC") 12(b)(1) (Subject Matter Jurisdiction).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Christopher John DiPompeo**, Jones Day, Washington, D.C., Counsel for Plaintiffs.

**Christopher James Carney**, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., Counsel for the Government.

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION TO DISMISS, PURSUANT TO RULE 12(b)(1) OF THE UNITED STATES COURT OF FEDERAL CLAIMS AND STAYING THIS CASE**

**BRADEN**, *Chief Judge*.

To facilitate review of this Memorandum Opinion And Order, the court has provided the following outline.

I.      RELEVANT FACTUAL BACKGROUND.

    A.      Historical Background – 1917 To June 30, 2016.

    B.      On June 30, 2016, Congress Enacted The Puerto Rico Oversight, Management, And Economic Stability Act.

    C.      On June 25, 2017, The Legislature Of The Commonwealth Of Puerto Rico Enacted Joint Resolution 188.

    D.      On August 23, 2017, The Legislature Of The Commonwealth Of Puerto Rico Enacted Act 106-2017.

II.     PROCEDURAL HISTORY.

III.    DISCUSSION.

    A.      Jurisdiction.

    B.      Standing.

    C.      The United States Court Of Federal Claims Has Jurisdiction To Adjudicate The Takings Clause Claim Alleged In The October 31, 2017 Amended Complaint, Pursuant To RCFC 12(b)(1).

        1.      The Puerto Rico Oversight, Management, And Economic Stability Act Does Not Evidence Congress' "Unambiguous Intention" To Withdraw Tucker Act Jurisdiction.

        2.      The Puerto Rico Oversight, Management, And Economic Stability Act Does Not Preempt The Tucker Act.

        3.      The Oversight Board Is An Entity Of The Federal Government.

IV.     CONCLUSION.

I.      RELEVANT FACTUAL BACKGROUND.

        A.      Historical Background – 1917 To June 30, 2016.[1]

        On March 2, 1917, on the eve of the United States' entry into World War I, President Woodrow Wilson signed the Jones-Shafroth Act, designating Puerto Rico as an unincorporated territory of the United States subject to federal statutes. *See* Pub. L. No. 64-368, 39 Stat. 951 § 9 (1917).  An unique feature of the Jones-Shafroth Act was that interest payments on bonds issued by Puerto Rico and its subdivisions were exempt from federal income, state, and local taxes, whether the purchasers resided in Puerto Rico or not. *See id.* § 3.

        On May 15, 1951, the territorial government of Puerto Rico enacted the Employees Retirement System ("ERS") Enabling Act, Act No. 447 ("Act No. 447"), to provide pensions and other benefits to certain governmental officers and employees of so-called public corporations and municipalities. *See* P.R. LAWS ANN. tit. 3, §§ 761, 763 (1951).  The primary funding for these benefits were employer contributions that statutorily were designated as ERS's "legal assets." *See* P.R. LAWS ANN. tit. 3, § 762.  Puerto Rico, however, did not hold or own any interest in employer contributions paid to the ERS. *See id.*  Any employer that failed to make timely contributions, however, faced a misdemeanor charge and, if payments were in arrears for more than 30 days, the ERS could assert a claim to and priority over any other entities holding outstanding debt. *Id.* §§ 781a(e), (f), (g).  In the event of non-payment, the ERS was authorized to garnish property tax revenues, if the delinquent party was a municipality or issue a certificate of debt for immediate payment, if the party was an agency, public corporation, or instrumentality of Puerto Rico. *Id.* §§ 781a(g), (h).  Employer contributions, however, were not sufficient to meet even the benefit costs "for many years." Am. Compl. ¶ 29.

        In 1952, the United States Congress ("Congress") designated Puerto Rico as a Commonwealth ("Puerto Rico" or the "Commonwealth") and required that the Legislature of Puerto Rico ("Legislature") authorize a Constitution, subject to ratification by Congress. *See, e.g.*, 48 U.S.C. § 731c (authorizing the Legislature to call a constitutional convention); 48 U.S.C. § 731d (requiring Congress to ratify Puerto Rico's Constitution).

        In 1961, Congress removed the Commonwealth's federally-mandated debt limit, on the condition that the Legislature amend Puerto Rico's Constitution and placed a limit on any future debt incurred. *See* Pub. L. No. 87-121, 75 Stat. 245 (1961).  That same year, the Commonwealth's Constitution was amended. *See* P.R. CONST. art. VI § 8.  Subsequently, however, a substantial amount of additional debt was incurred by Commonwealth municipalities that were permitted "to borrow between 5 percent and 10 percent of assessed value on their own, without including [C]ommonwealth debt in the calculation." MARC D. JOFFE & JESSE MARTINEZ, ORIGINS OF THE PUERTO RICO FISCAL CRISIS 12 (2016).

        In 1984, Congress enacted a law to prohibit the Commonwealth from declaring bankruptcy under Chapter 9, Title 11, United States Code. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (1984).  The Commonwealth's

---

[1]  The relevant facts discussed herein primarily were derived from the October 31, 2017 Amended Complaint ("Am. Compl. ¶¶ 23–82") and Exhibits ("Am. Compl. Ex. A–C").

Constitution, however, provided that "[t]he Secretary of the Treasury may be required to apply the available revenues[,] including surplus[,] to the payment of interest on the public debt and the amortization thereof in any case provided by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof." P.R. CONST. art. VI, § 2.

In 1996, Congress enacted a law to phase out the tax-exempt status of corporate income earned in Puerto Rico over a ten-year period. *See Small Business Job Protection Act of 1996*, Pub. L. No. 104-188, 110 Stat. 1755 (1996) (codified as amended at 26 U.S.C. § 936). At the end of that period, the Commonwealth was faced with debt that was significantly downgraded and placed on the "Credit Watch List." *See* Press Release, Government Development Bank For Puerto Rico, Moody's Downgrades Puerto Rico's Credit And Keeps It On Its Watchlist (May 8, 2006), http://gdb.pr.gov/communications/PressReleases/cpMoodysdowngradesPRcreditMay8-06.pdf. To raise revenues, the Commonwealth issued Sales Tax Revenue Bonds, the proceeds of which were deposited into an "Urgent Interest Fund," instead of the "General Fund." *See* Urgent Interest Fund Act, 2006 P.R. Laws 91.[2]

On January 31, 2008, pursuant to Act No. 447, as amended, the ERS Board of Trustees issued a Resolution ("January 31, 2008 ERS Bond Resolution") authorizing the ERS to issue one or more series of new bonds as "special obligations of the System payable solely from Pledged Property without recourse against other assets of [ERS]." Am. Compl. Ex. A. (January 31, 2008 ERS Bond Resolution) at VI-1. "Pledged Property" was defined therein as:

1. All ERS revenues, including employer contributions paid from the date the bond resolution came into effect "and any assets in lieu thereof or derived thereunder which are payable [to the ERS] pursuant to [the ERS Enabling Act]."

2. The "right, title, and interest" of the ERS regarding the revenues, including the right to receive them.

3. "Funds, accounts, and subaccounts held for the benefit of bondholders."

4. "Any and all other rights and personal property of every kind pledged and assigned by the ERS for additional security."

5. "Cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property [including], without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of [Pledged Property]."

Am. Compl. Ex. A at VI-36 (January 31, 2008 ERS Bond Resolution).

---

[2] "The General Fund is the primary operating fund of the Commonwealth." COMMONWEALTH OF PUERTO RICO, FINANCIAL INFORMATION AND OPERATING DATA REPORT 4 (Government Development Bank For Puerto Rico 2015).

To ensure that adequate collateral existed to support the January 31, 2008 bonds, the January 31, 2008 ERS Bond Resolution required that the security interests in or liens on "Pledged Property" were considered as "valid and binding as against all parties having claims . . . against the [ERS], irrespective of whether such parties have notice thereof."  Am. Compl. Ex. A at VI-8. "Pledged Property" also was to be "free and clear of any pledge, lien, charge, or encumbrance[.]" Am. Compl. Ex. A at VI-15.  In addition, the ERS was required to pursue "all available legal remedies" to collect unpaid employer contributions.  Am. Compl. Ex. A at VI-14, VI-16.  But, the ERS also was required to continue to "make timely principal and interest payments" on bonds purchased, pursuant to the January 31, 2008 ERS Bond Resolution, before any ERS funds were used for any other purpose.  Am. Compl. Ex. A at VI-8, VI-14, VI-36.

The January 31, 2008 ERS Bond Resolution also provided that any bonds issued thereunder were not obligations of the Commonwealth, its agencies, or its instrumentalities.  Am. Compl. Ex. A at VI-1.  On the last business day of each month, the ERS was required to transfer "[e]mployer [c]ontributions" to a designated Fiscal Agent, *i.e.*, the Bank of New York Mellon, for deposit into a "[r]evenue [a]ccount," by the next business day.  Am. Compl. Ex. A (Revenue Account) at VI-9.  In turn, the Fiscal Agent was responsible for making timely interest and principal payments to bondholders.  Am. Compl. Ex. A at VI-10.  Any other funds in the "Revenue Account" were to be allocated in the following order:

- first, to the Senior Bonds Debt Service Account;
- second, to the Senior Bonds Debt Service Reserve Account;
- third, to the Subordinated Bonds Debt Service Account;
- fourth, to the Subordinated Bonds Debt Service Reserve Account;
- fifth, to pay Operating Expenses; and
- sixth, to the General Reserve Account.

Am. Compl. Ex. A (Revenue Account) at VI-9.

Thereafter, the ERS issued three series of bonds in the total amount of $2,947,648,342.65,[3] the proceeds of which were used to pay for benefits and costs to fulfill reserve requirements and current benefit obligations.  Am. Compl. ¶ 33.

---

[3]  The ERS issued bonds on the following dates:
   a.  "Series A" Bonds in the amount of $1,588,810,799.60 on January 31, 2008.
   b.  "Series B" Bonds in the amount of $1,058,634,613.05 on June 2, 2008.
   c.  "Series C" Bonds in the amount of $300,202,930.00 on June 30, 2008.
Am. Compl. ¶ 33.
   With the exception of the date of issuance and commencement of interest payments—between March 1, 2008 and August 1, 2008—the material terms of the ERS bonds were identical. *Compare* $1,588,810,799.60 EMPLOYEES RETIREMENT SYSTEM OF THE COMMONWEALTH OF PUERTO RICO SENIOR PENSION FUNDING BONDS, SERIES A (2008), http://www.gdb. pr.gov/pdfs/public_corp/PensionBondsOS-Jan08-final.pdf, *with* $1,058,634,613.05 EMPLOYEES RETIREMENT SYSTEM OF THE COMMONWEALTH OF PUERTO RICO SENIOR PENSION FUNDING

On July 6, 2011, the Legislature amended the Employees Retirement System Enabling Act, authorizing the ERS Board of Trustees to raise additional capital by "tak[ing] on a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America." P.R. LAWS ANN. tit. 3, § 779d.

On February 11, 2014, all bonds issued by the Commonwealth, including ERS bonds, were rated as non-investment grade or "junk bonds." Press Release, Fitch Ratings, Fitch Downgrades Puerto Rico GO and Related Debt Ratings to 'BB'; Outlook Negative (Feb. 11, 2014), https://www.fitchratings.com/site/pr/820231. This triggered acceleration clauses requiring redemption of Commonwealth bonds within days that "would otherwise have been due in years." *Why Puerto Rico is in Trouble*, THE ECONOMIST, May 12, 2016, https://www.economist. com/the-economist-explains/2016/05/11/why-puerto-rico-is-in-trouble.

### B.    On June 30, 2016, Congress Enacted The Puerto Rico Oversight, Management, And Economic Stability Act.

On June 30, 2016, Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), pursuant to Article IV, Section 3, of the United States Constitution. *See* 48 U.S.C. §§ 2101–2241 (2012 & Supp. IV 2017).[4] Congress also emphasized

---

BONDS, SERIES B (2008), http://www.gdb.pr.gov/investors_resources/documents/2012-04-09-FinalOS-POBSeriesB.pdf, *and* $300,202,930 EMPLOYEES RETIREMENT SYSTEM OF THE COMMONWEALTH OF PUERTO RICO SENIOR PENSION FUNDING BONDS, SERIES C (2008), http://www.gdb.pr.gov/investors_resources/documents/ERSSeniorPensionFundingBonds-Series C_000.pdf.

[4] The enactment of PROMESA triggered an automatic stay of, *inter alia*, "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the Government of Puerto Rico" and "any act to create, perfect, or enforce any lien against the property of the Government of Puerto Rico" with respect to any "bond . . . or other financial indebtedness . . . of which the issuer, obligor, or guarantor is the Government of Puerto Rico and the date of issuance or incurrence precedes June 30, 2016." 48 U.S.C. §§ 2194(a)(1)(A)–(B), (b)(1), (4). On September 21, 2016, Plaintiffs, together with other ERS bond holders, filed a motion in the United States District Court for the District of Puerto Rico to lift the automatic stay, unless ERS and the Commonwealth provided adequate protection of Plaintiffs' property interests. *See* Motion Of Certain Secured Creditors Of The Employees Retirement System Of The Government Of The Commonwealth Of Puerto Rico For Relief From The PROMESA Automatic Stay, *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Garcia-Padilla*, No. 16-2696 (D.P.R. Sept. 21, 2016). On November 2, 2016, the District Court for the District of Puerto Rico issued an opinion denying Plaintiffs' September 21, 2016 Motion. *See Peaje Investments LLC v. Garcia-Padilla*, No. 16-2365, 2016 WL 6562426 (D.P.R. Nov. 2, 2016), *aff'd in part, vacated in part*, 845 F.3d 505 (1st Cir. 2017). On January 11, 2017 the United States Court of Appeals for the First Circuit issued an opinion vacating the United States District Court's denial of Plaintiffs' September 21, 2016 Motion and remanding the case. *See Peaje Investments LLC v. García-Padilla*, 845 F.3d 505, 516 (1st Cir. 2017). Subsequently, in January 2017, Plaintiffs, the Commonwealth, ERS, and the Oversight board entered into a stipulation to settle Plaintiffs' request

that PROMESA would "prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this chapter."  48 U.S.C. § 2103.  Congress also specified that the primary purpose of PROMESA was to provide a method for a territory of the United States "to achieve fiscal responsibility and access to the capital markets."  48 U.S.C. § 2121(a).  To accomplish this objective, Congress established an Oversight Board to assist the Commonwealth, and its instrumentalities, to better manage public finances.  *See* 48 U.S.C. §§ 2121(b)(2).[5]

Congress determined that the number of Oversight Board members should be limited to seven individuals, appointed by the President, but selected from lists provided by Congress.  *See* 48 U.S.C. § 2121(e).  Only these presidentially-appointed Oversight Board members had voting rights; the Commonwealth's Governor or designee was a "member," but only in an *ex officio* capacity.  *See* 48 U.S.C. § 2121(e)(3).  The sole authority to remove voting members, reappoint members to successive terms, and fill vacancies resided in the President.  *See* 48 U.S.C. § 2121(e)(5), (6).

The most important responsibility of the Oversight Board was to provide a budget to "the President, the House of Representatives Committee on Natural Resources[,] and the Senate Committee on Energy and Natural Resources, the Governor, and the Legislature."  48 U.S.C. § 2127(a).[6]  Toward that end, Congress required the Commonwealth to submit an annual Fiscal Plan for approval by the Oversight Board.  *See* 48 U.S.C. § 2141(a).  The Fiscal Plan was required to estimate revenues and expenditures, based on current law or specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan and "achieve fiscal responsibility and access to the capital markets."  48 U.S.C. § 2141(b).  If the Oversight Board determined that the Fiscal Plan was not satisfactory, the Governor of the Commonwealth was allowed to make other recommendations.  *See* 48 U.S.C. § 2141(c)(3).  If the Governor did not submit a satisfactory plan, the Oversight Board had the authority to present an alternative plan to the Governor, that would be "deemed approved by the Governor[.]"  *See* 48 U.S.C. § 2141(e)(2).

Congress also empowered the Oversight Board to "designate any territorial instrumentality as a covered territorial instrumentality[,] that is subject to the requirements of [PROMESA]."  48 U.S.C. § 2121(d)(1).  All Commonwealth instrumentalities were required to comply with the certified Fiscal Plan or provide the Oversight Board with a separate Instrumentality Fiscal Plan and ensure that the Legislature did not enact any new law that did not comply with the certified Fiscal Plan.  *See* 48 U.S.C. §§ 2121, 2144.  If the Oversight Board's effort was unsuccessful, Congress authorized the Oversight Board to file a petition to restructure the debts of any

---

for adequate protection.  *See* Order Approving Stipulation, *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Garcia-Padilla*, No. 16-2696 (D.P.R. Jan. 17, 2017).

[5] Congress authorized the Oversight Board to retain "federal employees," and to use federal property.  *See* 48 U.S.C. §§ 2122, 2123(b).  In addition, the Oversight Board was responsible for providing a budget for the Commonwealth to "the President, the House Committee on Natural Resources, and the Senate Committee on Energy and Natural Resources, the Governor, and the Legislature."  48 U.S.C. § 2127(a).

[6] To accomplish this objective, Congress also authorized the Oversight Board to "secure directly from any department or agency of the United States information necessary to enable it to carry out this chapter[.]"  *See* 48 U.S.C. § 2124(b)(1).

government instrumentality in a court-supervised adjustment process similar to Chapter 9 of the Bankruptcy Code. *See* 48 U.S.C. §§ 2146, 2164. The sole authority to file such a petition, as well as to modify or file an adjustment consistent with the Fiscal Plan, was delegated to the Oversight Board. *See* 48 U.S.C. §§ 2164(a), 2172, 2173, 2174(b)(7). In the event of a Title III filing, the Oversight Board was designated to be responsible for representing the debtor. *See* 48 U.S.C. § 2175.

After the enactment of PROMESA, one of the Oversight Board's "first actions was to instruct the Governor to provide a fiscal plan for the Commonwealth by October 14, 2016." Am. Compl. ¶ 64. The Commonwealth's "original October 14, 2016 [F]iscal [P]lan would have left intact the ERS and the system . . . for making pension payments." Am. Compl. ¶ 65. On November 23, 2016, however, the Oversight Board rejected the Governor's proposed Fiscal Plan, concluding that the pension system and the ERS' unfunded liabilities needed to be addressed further. Am. Compl. ¶ 65. By letters dated December 20, 2016 and January 18, 2017, the Oversight Board informed the Governor that the Commonwealth must consider new payment sources and mechanisms for pensions. Am. Compl. ¶ 65.

As of "February 2017, the aggregate principal amount of the interest-bearing ERS bonds plus the accreted value of the zero coupon or capital appreciation ERS bonds"[7] was approximately $3,156,000,000. Am. Compl. ¶ 36. All of these ERS bonds were secured by collateral defined as "Pledged Property" in the January 31, 2008 ERS Bond Resolution. Am. Compl. ¶ 40. On February 28, 2017, the Commonwealth submitted a revised fiscal plan to increase employer contributions to the ERS to fund existing benefits in full. Am. Compl. ¶ 66.

On March 13, 2017, the Commonwealth's revised plan was approved by the Oversight Board, subject to an amendment, requiring additional legislative measures by June 30, 2017, to liquidate ERS assets, including the Pledged Property that serve as collateral for ERS bonds, and "transfer" the proceeds to the Commonwealth's General Fund. Am. Compl. ¶ 67.

On May 3, 2017, the Oversight Board filed a Title III petition for the Commonwealth. Am. Compl. ¶ 70. Subsequently, Chief Justice John Roberts appointed Judge Laura Swain, of the United States District Court for the Southern District of New York, as the presiding judge in the Title III proceedings in the District Court for the District of Puerto Rico, pursuant to PROMESA. *See* 48 U.S.C. § 2168(a) ("For cases in which the debtor is a territory, the Chief Justice of the United States shall designate a district court judge to sit by designation to conduct the case."). On May 21, 2017, the Oversight Board filed a Title III petition for ERS. Am. Compl. ¶ 71.[8]

---

[7] The "accreted value" of capital appreciation ERS bonds refers to the "accrued portion of the face amount." Am. Compl. ¶ 36 n.1.

[8] The filing of the May 21, 2017 Petition triggered the automatic stay provisions of the Bankruptcy Code, that stayed, *inter alia*, "the commencement or continuation . . . of a judicial administrative, or other action or proceeding" and "any act to create, perfect, or enforce any lien against property[.]" *See* 11 U.S.C. § 362(a)(1), (4); 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 362 into PROMESA). On May 31, 2017, ERS bondholders, including Plaintiffs, filed a motion to lift the automatic stay or, in the alternative, for adequate protection. *See* Motion Of Certain Secured Creditors Of The Employees Retirement System Of The Government Of The

On May 29, 2017, the Oversight Board sent a non-public letter to the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") requesting that the Commonwealth's revenue forecasts be revised.  Am. Compl. ¶ 68.  In response, the Commonwealth's Fiscal Plan was amended to reflect an additional $734 million in revenue, "in part due to pension reimbursements from other agencies."  Am. Compl. ¶ 68.

### C.      On June 25, 2017, The Legislature Of The Commonwealth Of Puerto Rico Enacted Joint Resolution 188.

On June 25, 2017, the Legislature enacted Joint Resolution For Other Allocations For Fiscal Year 2017-2018 ("Joint Resolution 188"), that was adopted by the Oversight Board "on behalf of the Governor on June 30, 2017."  Am. Compl. ¶ 71 n.18.[9]  Joint Resolution 188 required the ERS[10] to sell all assets and transfer the net proceeds into the Commonwealth's Treasury Secretary's account, as part of the General Fund for fiscal year 2017-2018, in order to make benefit payments to pensioners.  *See* Joint Resolution 188 §§ 1–3.  Joint Resolution 188 also provided that "the General Fund, through the pay-as-you-go system, shall assume any payments that the three Retirement Systems cannot make."  *See* Joint Resolution 188 § 4(1).  In addition, the ERS was to "continue to meet [its] obligations . . . by contributing available funds and funds arising from the sale of [ERS] assets to the General Fund."  Joint Resolution 188 § 4(2).  But, "[e]mployer contributions . . . to the [ERS were] eliminated."  Joint Resolution 188 § 4(3).

---

Commonwealth Of Puerto Rico Request For Adequate Protection And For Relief From The Automatic Stay, *In re The Financial Oversight And Management Board For Puerto Rico v. The Employees Retirement System Of The Government Of The Commonwealth Of Puerto Rico*, No. 17-3566, Dkt. No. 26 (D.P.R. May 31, 2017).  On July 14, 2017, the parties entered into a joint stipulation as to adequate protection, stating that ERS would provide the ERS bondholders certain protections, including: (1) the payment of current interest due on the ERS bonds; and (2) monthly deposits of $18.5 million from June through October 2017 into a newly-created, segregated account.  *See* Notice Of Filing Of Joint Stipulation, *In re The Financial Oversight And Management Board For Puerto Rico v. The Employees Retirement System Of The Government Of The Commonwealth Of Puerto Rico*, No. 17-3566, Dkt. No. 170 (D.P.R. July 14, 2017).  On July 17, 2017, the United States District Court for the District of Puerto Rico approved the July 14, 2017 Joint Stipulation, but "retain[ed] jurisdiction over any and all matters arising from or related to the implementation or interpretation of the [July 14, 2017 Joint Stipulation] or th[e] Order."  Order Approving Joint Stipulation, *In re The Financial Oversight And Management Board For Puerto Rico v. The Employees Retirement System Of The Government Of The Commonwealth Of Puerto Rico*, No. 17-3566, Dkt. No. 171 (D.P.R. July 17, 2017).

[9] *See* Am. Compl. Ex. B. (certified unofficial English translation of Joint Resolution 188).

[10]   Joint Resolution 188 listed the individual retirement systems that comprise the ERS as "the Central Government and Judiciary Retirement Systems and the Teachers' Retirement System."  *See* Joint Resolution 188 (Statement of Legislative Intent).

### D.      On August 23, 2017, The Legislature Of The Commonwealth Of Puerto Rico Enacted Act 106-2017.

On August 23, 2017, the Legislature enacted a Law To Guarantee Payment To Our Pensioners And Establish A New Plan For Defined Contributions For Public Servants ("Act 106-2017"). Act 106-2017 § 2.1.[11]  The purpose of Act 106-2017 was to "faithfully implement[] the Fiscal Plan certified by the Oversight Board," "work within the parameters of PROMESA," and "meet the requirements demanded by the Oversight Board," based on "provisions on pension reform in the Fiscal Plan." Act 106-2017 (Statement of Legislative Intent). Significant aspects of Act 106-2017 included: providing for the treatment and the payment terms of accumulated pensions and associated accounts; establishing a defined contribution program; creating a retirement board to replace existing boards; and providing transition rules. *See* Act 106-2017 §§ 2.1–2.3, 3.1–3.9, 4.1–4.2, 5.1–5.3. Act 106-2017 also required the Commonwealth to assume any payments that the ERS could not make, contribute ERS assets to the Commonwealth, and allow the Commonwealth, and Commonwealth public corporations and municipalities, to stop making contributions to the ERS. Act 106-2017 (Statement of Legislative Intent). Finally, Act 106-2017 required the ERS Board of Trustees to dissolve by December 31, 2017 so that a new board could be formed to dispose of ERS property. *See* Act 106-2017 §§ 4.2, 5.1–5.3.

## II.    PROCEDURAL HISTORY.

On July 19, 2017, Plaintiffs filed a Complaint in the United States Court of Federal Claims. ECF No. 1.  On October 20, 2017, Plaintiffs filed an Unopposed Motion For Leave To File An Amended And Supplemented Complaint. ECF No. 8. On October 31, 2017, the court issued an Order granting Plaintiffs' October 20, 2017 Unopposed Motion. ECF No. 9. The October 31, 2017 Amended Complaint alleged that "[t]he Oversight Board, working with and acting through the Commonwealth, designed and approved Act 106-2017 and directed and required the Commonwealth to enact it. Act 106-2017, in and of itself and in conjunction with Joint Resolution 188 appropriated Plaintiffs' property interest without just compensation, including the contractual right to receive principal and interest due to plaintiffs." ECF No. 10 at ¶ 89. In the alternative, the October 31, 2017 Amended Complaint alleged that the Commonwealth acted "under the authority of the Federal Government," because the Commonwealth was obligated to comply with the Oversight Board's directives to enact Joint Resolution 188 and Act 106-2017. ECF No. 10 at ¶ 92.

On December 8, 2017, the Government filed a Motion To Dismiss, arguing that the court does not have jurisdiction to adjudicate Plaintiffs' Takings Clause claim, because: (1) the Oversight Board is not part of the United States Government; (2) Congress authorized the United States District Court for the District of Puerto Rico with exclusive jurisdiction to adjudicate creditors' claims against the Commonwealth and the Oversight Board; (3) the October 31, 2017 Amended Complaint is barred by 28 U.S.C. § 1500; (4) Plaintiffs' Takings Clause Claim is not ripe for adjudication; and, in the alternative, (5) Plaintiffs' October 31, 2017 Amended Complaint fails to state a claim on which relief may be granted. ECF No. 14.

---

[11]   *See* Am. Compl. Ex. C.  (certified unofficial English translation of Act 106-2017).

On January 26, 2018, Plaintiffs filed a Response In Opposition To The Government's December 8, 2017 Motion To Dismiss. ECF No. 21. On March 9, 2018, the Government filed a Reply. ECF No. 24.

On June 11, 2018, the court convened an oral argument. ECF No. 29 ("TR 1–180").

On July 6, 2018, the parties filed a Joint Submission summarizing proceedings pending in the United States District Court for the District of Puerto Rico concerning PROMESA. ECF No. 30.

## III.    DISCUSSION.

### A.    Jurisdiction.

Congress authorized the United States Court of Federal Claims to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (the "Tucker Act"). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"). Specifically, a complaint must allege a source of substantive law that "can fairly be interpreted as mandating compensation by the Federal Government." *Testan*, 424 U.S. at 400. In addition, the United States Court of Appeals for the Federal Circuit has held that the "Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) (citing *Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005)).

The October 31, 2017 Amended Complaint alleges that the Oversight Board violated the Takings Clause of the Fifth Amendment by requiring the Legislature to enact Joint Resolution 188 and Act 106-2017, that appropriated, without just compensation, Plaintiffs' constitutionally-protected property, *i.e.*, "Pledged Property," as defined in the January 31, 2008 ERS Bond Resolution, that served as collateral for ERS bonds that Plaintiffs purchased, including the right to receive timely payment of principal and interest. Am. Compl. ¶¶ 5, 84–93. Based on these allegations, the court has jurisdiction to adjudicate the constitutional claim alleged in the October 31, 2017 Amended Complaint. *See* RCFC 12(b)(1); *see also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1010–14 (1992) (holding that plaintiff was entitled to compensation for a legislative taking).

**B.     Standing.**

Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The party invoking federal jurisdiction "bears the burden of establishing the[] elements [of standing]." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (same). To meet this burden at the pleading stage, the complaint must "clearly . . . allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547 (internal omission and quotation marks omitted); *see also McKinney v. United States Dep't of Treasury*, 799 F.2d 1544, 1557 (Fed. Cir. 1986) ("The facts alleged in the complaint, taken as true for purposes of a standing analysis, must be sufficient to show that a party has suffered, or is likely to suffer, an injury in fact.").

As a matter of law, to establish standing in the United States Court of Federal Claims,[12] a complaint must allege sufficient facts to show that a plaintiff:

> (1) has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000); *see also Figueroa v. United States*, 466 F.3d 1023, 1029 (Fed. Cir. 2006) (same).

The October 31, 2017 Amended Complaint alleges that: (1) Plaintiffs have a "property interest" in the form of valid and enforceable liens on "Pledged Property" and the right to receive "timely payment of principal and interest" as defined in the January 31, 2008 ERS Bond Resolution, pursuant to which Plaintiffs purchased ERS bonds (Am. Compl. ¶ 85); and (2) Congress authorized the Oversight Board to design, approve, and direct the Legislature to enact Joint Resolution 188 and Act 106-2017, resulting in the appropriation of Plaintiff's property, without just compensation. Am. Compl. ¶¶ 87–90. These allegations collectively, if established, show that Plaintiffs have suffered economic injury, in fact, that is concrete and actual, and is directly traceable to acts of the Oversight Board, established by Congress. The October 31, 2017 Amended Complaint also requests: (1) "just compensation in an amount equal to the principal amount of the ERS Bonds, together with all interest accrued to the date of payment;" (2) attorney's fees and costs; and (3) "further relief as the Court deems just and proper." Am. Compl. at 26, ¶¶ I–III (Prayer for Relief). Therefore, the alleged injury is "likely redressable by a favorable judicial decision." *Figueroa*, 166 F.3d at 1029.

---

[12] The standing requirements of Article III of the United States Constitution also apply to the United States Court of Federal Claims. *See Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (stating that the United States Court of Federal Claims, "though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III") (internal citation omitted).

For these reasons, the court has determined that the October 31, 2017 Amended Complaint properly has alleged each of the requisite elements to establish that Plaintiffs have standing to seek an adjudication of their Fifth Amendment Takings Clause claim.

C.   **The United States Court Of Federal Claims Has Jurisdiction To Adjudicate The Takings Clause Claim Alleged In The October 31, 2017 Amended Complaint, Pursuant To RCFC 12(b)(1).**

1.   **The Puerto Rico Oversight, Management, And Economic Stability Act Does Not Evidence Congress' "Unambiguous Intention" To Withdraw Tucker Act Jurisdiction.**

A claim for just compensation under the Takings Clause of the Fifth Amendment of the United States Constitution "must be brought in the [United States] Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statutes." *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1998) (plurality opinion); *see also Horne v. Dep't of Agric.*, 569 U.S. 513, 527 (2013) ("A claim for just compensation under the Takings Clause must be brought to the [United States] Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute."); *Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988) (Tucker Act "jurisdiction is 'exclusive' . . . to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the [United States Court of Federal Claims]."). Congress, however, may withdraw Tucker Act jurisdiction by enacting a statute that evidences Congress' "unambiguous intention to withdraw the Tucker Act remedy[.]" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984).

In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), the United States Supreme Court held that the proper inquiry, "[i]n determining whether a Tucker Act remedy [*i.e.*, "just compensation"] is available for claims arising out of a taking[,] . . . [is] whether Congress has[,] *in the [other] statute*[,] withdrawn the Tucker Act grant of jurisdiction to the Court of Claims to hear a suit involving the statute founded . . . upon the Constitution." *Id.* at 1017 (italics added) (internal quotation marks and corrections omitted). For this reason, the United States Court of Appeals for the Federal Circuit has held, "[w]ithdrawal of Tucker Act jurisdiction by implication is disfavored, . . . a court must find that the statute at issue . . . reflects an unambiguous congressional intent to displace the Tucker Act's waiver of sovereign immunity." *Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007).

The Government contends, however, that Tucker Act jurisdiction is withdrawn by Section 2126(a) of PROMESA, that provides:

> Except as provided in section 2124(f)(2) of this title (relating to the issuance of an order enforcing a subpoena), and subchapter III (relating to adjustments of debts), any action against the Oversight Board, and any action otherwise arising out of this chapter, in whole or in part, shall be brought in a United States district court for the covered territory[.]

48 U.S.C. § 2126(a).

The Government also argues that "[S]ection 2126(a) vests jurisdiction over 'any action otherwise arising out of PROMESA, in whole or in part,' in the [United States D]istrict [C]ourt" for the District of Puerto Rico. ECF No. 24 at 8 (quoting 48 U.S.C. § 2126(a)). Moreover, as the United States Supreme Court has explained, "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (1976)). So, the Government reasons that it does not matter that PROMESA does not expressly mention the Tucker Act. ECF No. 24 at 9. And, the United States Supreme Court has held that statutory language designating that another court "shall have jurisdiction" over a particular category of cases can be sufficient to displace the Tucker Act. *See Hinck v. United States*, 550 U.S. 501, 506–08 (2007).

Subsequently, in *Horne v. Department of Agriculture*, 569 U.S. 513 (2013), however, the United States Supreme Court provided additional guidance to federal trial courts in determining "whether a statutory scheme displaces Tucker Act jurisdiction, *i.e.*, the trial court "must examine the purpose of the statute, the entirety of its text, and the structure of review that it establishes." *Id.* at 527 (internal quotation marks and corrections omitted).

Certainly, Section 2126(a) of PROMESA reflects Congress' intent that the United States District Court for the District of Puerto Rico is the proper venue with jurisdiction to adjudicate: (1) "any action against the Oversight Board;" and (2) "any action otherwise arising out of this chapter, in whole or in part." *See* 48 U.S.C. § 2126(a); *see also United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993) ("A statute's plain meaning must be enforced . . . and the meaning of a statute will typically heed the commands of its punctuation.").

But, the plain language of Section 2126(a) of PROMESA does not express Congress' "unambiguous intention" to withdraw Tucker Act jurisdiction. *See Acceptance Ins.*, 503 F.3d at 1336. In fact, there is nothing in the text of PROMESA that either refers to the Tucker Act or the Government's waiver of sovereign immunity thereunder. *See* 48 U.S.C. §§ 2101–2241; *see also Monsanto*, 467 U.S. at 1018–19 (holding that the absence of such provisions "cannot be construed to reflect an unambiguous intention to withdraw the Tucker Act remedy"). Nor does the legislative history mention the Tucker Act or that PROMESA should be construed to deny a plaintiff's right guaranteed by the United States Constitution to seek an adjudication of a Takings Clause claim in the United States Court of Federal Claims. *See* H.R. Comm. on Natural Resources, Puerto Rico Oversight, Management, and Economic Stability Act, H.R. Rep. No. 114-602 (2016). *Cf. Moda Health Plan, Inc. v. United States*, 892 F.3d 1311 (holding that the legislative history of Congress' appropriations bills for Fiscal Year 2015 and Fiscal Year 2016 "clearly indicated [Congress'] intent . . . to temporarily cap the payments required by the [Patient Protection and Affordable Care Act]").

Nevertheless, the Government insists that a Takings Clause claim, based on actions taken by the Oversight Board, necessarily is a claim "arising out of" PROMESA.[13]  Gov't Mot. at 27

---

[13] Section 2126(a) also is broader than 7 U.S.C. § 1506(d), the jurisdictional provision at issue in *Acceptance Insurance*. *Compare* 48 U.S.C. § 2126(a) ("any action against the [federal entity], *and any action otherwise arising out of this chapter, in whole or in part*, shall be brought in a United States district court") (italics added), *with* 7 U.S.C. § 1506(d) ("The district courts of

(citing *Weinberger v. Salfi*, 422 U.S. 749, 760-61 (1975) (holding that an illegal exaction claim challenging the Social Security Act did not arise under the Takings Clause, because "not only is it Social Security benefits which appellees seek to recover, but it is the Social Security Act which provides both the *standing* and the *substantive basis* for the presentation of their constitutional contentions.") (italics added)).   Therefore, the Government concludes that the Takings Clause claim alleged in the October 31, 2017 Amended Complaint must arise out of PROMESA.  ECF No. 24 at 8.

In this case, however, Plaintiffs' "standing" is derived from Article III of the United States Constitution and the "substantive basis" of the claim alleged in the October 31, 2017 Amended Complaint is derived from the Takings Clause.

Nor does the jurisdictional provision in Section 2166, governing bankruptcy proceedings filed under Title III of PROMESA, evidence that Congress unambiguously intended to withdraw Tucker Act jurisdiction in Section 2126(a).

The text of Section 2166(a) of PROMESA provides:

The district courts shall have—

(1) except as provided in paragraph (2), original and exclusive jurisdiction of all cases under this subchapter; and
(2) except as provided in subsection (b), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, original but not exclusive jurisdiction of all civil proceedings arising under this subchapter, or arising in or related to cases under this subchapter.

48 U.S.C. § 2166(a).

The purpose of Section 2166(a) is to preempt other federal courts from exercising jurisdiction in cases arising under the bankruptcy provision of PROMESA, *i.e.*, Title III.  The fact that PROMESA does not include similar language in Section 2126(a) confirms that Congress did not unambiguously intend to withdraw Tucker Act jurisdiction for Takings Clause claims.  *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal corrections omitted) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).  Therefore, the plain meaning of Section 2126(a) does not mandate Plaintiffs to adjudicate their Takings Clause claim in the United States District Court for the District of Puerto Rico.

---

the United States . . . shall have exclusive original jurisdiction. . . of all suits brought by or against the [federal entity]."). And, the clause in Section 2126(a) of PROMESA providing that "any action otherwise arising out of this chapter, in whole or in part" necessarily includes any action filed against the United States. *See Gonzales*, 520 U.S. at 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (quoting Webster's Third New International Dictionary 97 (1976)).

As an aside, the Government suggests that "it is improbable that Congress intended . . . to permit debt holders to seek dollar-for-dollar compensation against the United States in the [United States] Court of Federal Claims." Gov't Mot. at 26 (citing *E. Enters.*, 524 U.S. at 517–19 ("Congress could not have contemplated that the [United States Department of the] Treasury would compensate coal operators for their liability under the [Coal Industry Retiree Health Benefit Act of 1992], for every dollar paid . . . would be presumed to generate a dollar of Tucker Act compensation.") (internal quotation marks and alterations omitted)). The Government concludes this is so, because PROMESA does not authorize federal funds to pay the Commonwealth debt. *See* 48 U.S.C. § 2150(c). But, the Government mischaracterizes the October 31, 2017 Amended Complaint. Plaintiffs are not seeking to collect "dollar-for-dollar" payment from the United States for the Commonwealth's debt. Instead, the October 31, 2017 Amended Complaint alleges that Plaintiffs are seeking "just compensation," if their Takings Clause claim is adjudicated and determined to be valid. Am. Compl. ¶¶ 83–93.

For these reasons, the court has determined that PROMESA does not unambiguously withdraw Tucker Act jurisdiction to adjudicate the Takings Clause claim alleged in the October 31, 2017 Amended Complaint.

## 2.     The Puerto Rico Oversight, Management, And Economic Stability Act Does Not Preempt The Tucker Act.

Congress may preempt Tucker Act jurisdiction by "a precisely drawn, detailed statute" that "assertedly impos[es] *monetary liability* on the United States [and] *contains its own judicial remedies.*" *United States v. Bormes*, 568 U.S. 6, 12–13 (2012) (italics added) (internal quotation marks and citation omitted). Only claims covered by such a remedial scheme are preempted. *See Vereda, Ltda. v. United States*, 271 F.3d 1367, 1375 (Fed. Cir. 2001) ("When such a specific and comprehensive scheme for administrative and judicial review is provided by Congress, . . . Tucker Act jurisdiction *over the subject matter covered by the scheme* is preempted.") (italics added) (internal quotation marks and citation omitted). Under these circumstances, the United States Supreme Court has held that a "specific remedial scheme establishes the exclusive framework for the liability of Congress created under the statute" and "displace[s]" the Tucker Act. *See Bormes*, 568 U.S. at 12.

The United States Supreme Court has "frequently repeated the view that, in the event of a taking, [a] compensation remedy is required by the Constitution." *First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A.*, 482 U.S. 304, 316 (1987). In other words, a taking "necessarily implicates the constitutional obligation to pay just compensation." *Id.* at 315 (quotation marks omitted); *see also Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 799–800 (Fed. Cir. 1993) ("There can be no dispute that the taking of private property for public use requires the payment of compensation under the Constitution."). The Tucker Act authorizes the court to adjudicate Takings Clause claims, but also provides the Constitutional remedy of "just compensation." *See* U.S. CONST. amend. V, Takings Clause; *see also First English Evangelical*, 482 U.S. at 314 (holding that the Fifth Amendment's Takings Clause "is designed . . . to secure compensation in the event of otherwise proper interference amounting to a taking.") (italics omitted).

In *Hinck v. United States*, 550 U.S. 501 (2007), the United States Supreme Court considered the remedial scheme provided by Taxpayer Bill of Rights 2, stating that "[t]he Tax Court shall have jurisdiction over any action brought by a taxpayer who meets the [statutory] requirements . . . to determine whether the [Treasury] Secretary's failure to abate interest under this section was an abuse of discretion, and may order an abatement, if such action is brought within 180 days after the date of the mailing of the Secretary's final determination not to abate such interest." 26 U.S.C. § 6404(h)(1) (2006). The Court held that this statute preempted Tucker Act jurisdiction, because it was "a precisely drawn, detailed statute that, in a single sentence, provide[d] a forum for adjudication, a limited class of potential plaintiffs, a statute of limitations, a standard of review, and authorization for judicial relief." *Hinck*, 550 U.S. at 506 (internal quotation marks omitted).[14]

In *Horne v. Department of Agriculture*, 569 U.S. 513 (2013), the United States Supreme Court considered whether the remedial scheme in the Agricultural Marketing Agreement Act of 1937 ("AMAA") was sufficiently "comprehensive" to preempt Tucker Act jurisdiction. *Id.* at 516. Under the AMAA, a plaintiff was entitled an administrative hearing to determine whether any order issued by the Secretary of the Department of Agriculture "or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and [to pray] for a modification thereof or to be exempted therefrom." 7 U.S.C. § 608c(15)(A). The AMAA also specified that a plaintiff could seek review of that ruling in a federal district court. *Horne*, 569 U.S. at 527 ("Once the Secretary issues a ruling, the federal district court where the 'handler is an inhabitant, or has his principal place of business' is 'vested with jurisdiction . . . to review [the] ruling.'"). In light of these remedial safeguards, the United States Supreme Court concluded that, "[t]hese statutory provisions afford [plaintiffs] a ready avenue to bring a [T]akings [Clause] claim against the [federal government]," *id.* at 527, and preempted Tucker Act jurisdiction over petitioners' Takings Clause claim. *Id.* at 527–28. But, the Court also observed that a plaintiff who did not have access to such a robust review process could still file a claim in the United States Court of Federal Claims for "just compensation." *Horne*, 569 U.S. at 526 n.7.

In addition, the United States Court of Appeals for the Federal Circuit has considered whether a statutory "remedial scheme" preempted Tucker Act jurisdiction in two cases. In *Marcum LLP v. United States*, 753 F.3d 1380 (Fed. Cir. 2014), the statute at issue, the Criminal Justice Act ("CJA"), provided that "counsel for an indigent defendant may request expert services necessary for adequate representation." *Id.* at 1381 (citing 18 U.S.C. § 3006A(e)(1)). The CJA also provided that "[c]ompensation to be paid to a person for services rendered by him to a person . . . shall not exceed $2,400, exclusive of reimbursement for expenses reasonably incurred[.]" 18 U.S.C. § 3006A(e)(3). If expenses exceeded $2,400, however, the United States District Court could certify those expenses, "as necessary to provide fair compensation for services of an unusual character or duration[.]" *Id.* In addition, the CJA provided that any certification of expenses also must be approved by the Chief Judge of the regional circuit. *Id.* Because the CJA set forth such "an explicit procedure for court-appointed service providers to collect compensation for their services," the United States Court of Appeals for the Federal Circuit held that "the CJA

---

[14] The holding in *Hinck*, 550 U.S. at 506, was based on the remedial scheme set out in the Tax Payers Bill of Rights 2, not the phrase "shall have jurisdiction," as the Government contends. ECF No. 24 at 9.

is a self-executing remedial scheme for the review of fee awards" so that granting "jurisdiction under the Tucker Act on Fifth Amendment [T]akings [Clause] grounds[,] would undermine that Act's express intent to limit the scope of review." *Marcum*, 753 F.3d at 1384.

More recently, in *Alpine PCS, Inc. v. United States*, 878 F.3d 1086 (Fed. Cir. 2018), *petition for cert. docketed*, No. 17-1507 (May 7, 2018), the United States Court of Appeals for the Federal Circuit considered whether the "remedial scheme" in the Communications Act of 1934 preempted Tucker Act jurisdiction over a Takings Clause claim. *Id.* The remedial scheme at issue was implemented by Federal Communications Commission ("FCC") regulations that afford "any person who is aggrieved or whose interests are adversely affected by a determination" to petition the Chief of the Telecommunications Bureau of the FCC. *See* 47 U.S.C. § 402(b)(6); *see also* 47 C.F.R. § 1.925. If the Chief issued an adverse decision, the plaintiff could file an appeal to the Commission. *See* 47 C.F.R. § 1.115. If the Commission affirmed the Chief's decision, the plaintiff could seek direct judicial review from the United States Court of Appeals for the District of Columbia. *See* 47 U.S.C. § 402(b). Under these circumstances, our appellate court held that "the Communications Act [of 1934] provides a comprehensive statutory scheme through which [appellant] . . . could challenge the alleged taking and receive a remedy that could have provided just compensation in this case, foreclosing jurisdiction under the Tucker Act." *Alpine PCS*, 878 F.3d at 1088.

Section 2126(a) of PROMESA, however, does not include a "comprehensive remedial scheme" sufficient to preempt Tucker Act jurisdiction.

Section 2126(a) provides:

> Except as provided in section 2124(f)(2) of this title (relating to the issuance of an order enforcing a subpoena), and subchapter III (relating to adjustments of debts), *any action against the Oversight Board, and any action otherwise arising out of this chapter, in whole or in part, shall be brought in a United States district court for the covered territory* or, for any covered territory that does not have a district court, in the United States District Court for the District of Hawaii.

48 U.S.C. § 2126(a) (italics added).

Section 2126(a) contains no "judicial remedy" to adjudicate the constitutionally protected right that affords Plaintiffs the right to such an adjudication of their Takings Clause claim. *See Bormes*, 568 U.S. at 12 ("The Tucker Act is displaced, . . . when a law assertedly imposing monetary liability on the United States contains its own judicial remedies."); *see also Vereda*, 271 F.3d at 1375 ("When such a specific and comprehensive scheme for administrative and judicial review is provided by Congress, . . . Tucker Act jurisdiction over the subject matter covered by the scheme is preempted.") (internal quotation marks omitted). At oral argument, the Government advised the court that *Alpine PCS* stands for the proposition that "a comprehensive remedial scheme [does not] need to be one that includes mone[tary damages]." TR at 94; *see also* TR at 100 ("[I]n cases like *Eastern Enterprise[s]*, and under Federal Circuit precedent, like *Alpine PCS*, if there [i]s complete relief available through a declaratory and injunctive mechanism, then it [i]s the case that monetary compensation [does not] ha[ve] to be available in th[e] Court [of Federal Claims]." (italics added)). It is true that the United States Court of Appeals for the Federal Circuit,

in dicta, observed that "compensation in a form other than monetary damages *can* be constitutionally adequate," but only because the FCC could "grant [the plaintiff] adequate relief, by eliminating the taking, providing compensation, or some combination." *Alpine PCS*, 878 F.3d at 1096–97 (italics added). The court is aware of no case that holds that injunctive and declaratory relief alone equates with "just compensation," required by the Takings Clause. The plurality opinion in *Eastern Enterprises* held that the Takings Clause was violated but where the plaintiff only requested injunctive and declaratory relief and the Court observed that "the nature of the governmental action . . . [was] quite unusual." *Id.* at 537 (plurality opinion). In this case, however, Plaintiffs seek "just compensation," equal to payment of the principal amount of the ERS Bonds[,] together with all interest accrued to the date of payment under the Fifth Amendment for the United States' taking of their property." Am. Compl. at 26.

Although Section 2126(a) contemplates "declaratory or injunctive relief against the Oversight Board, including relief permitting or requiring the obligation, borrowing, or expenditure of funds," its terms do not provide for "just compensation," as required by the United States Constitution, if a taking is established. *See* 48 U.S.C. § 2126(c). Thus, Section 2126(a) did not "assertedly impos[e] monetary liability on the United States," or "contain[] its own judicial remedies" for awarding "just compensation." *See Bormes*, 568 U.S. at 12–13. In sum, Section 2126(a) does not include either a prerequisite "self-executing" judicial remedy or a monetary surrogate for "just compensation" and therefore cannot preempt the Tucker Act. *Id.* at 11.

In any event, assuming, *arguendo*, that PROMESA could be construed to preempt Tucker Act jurisdiction, such a construction implicates significant constitutional issues. *See Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 134 (1974) ("[W]hen one admissible construction will preserve a statute from unconstitutionality and another will condemn it, the former is favored even if language, and arguably the legislative history point somewhat more strongly in another way.") (internal quotation marks, alterations, and citation omitted); *see also id.* ("There are clearly grave doubts about whether the Rail Act would be constitutional[,] if a Tucker Act remedy were not available as compensation for any unconstitutional erosion not compensated under the Act itself."); *First English Evangelical*, 482 U.S. at 315 ("[G]overnment action that works a taking of property rights necessarily implicates the 'constitutional obligation to pay just compensation.'" (citation omitted)). Properly construed, however, the Tucker Act and PROMESA are capable of "co-existence," affording Plaintiffs the right to seek adjudication against the United States for "just compensation" in the United States Court of Federal Claims and declaratory relief, if requested, in the United States District Court for the District of Puerto Rico. *See Blanchette*, 419 U.S. at 133–34 (holding that, "since the Tucker Act and the Rail Act are capable of co-existence, it is the duty of the court, absent a clearly expressed congressional intention to the contrary, to reward each as effective.") (internal quotation marks omitted). In fact, "[t]he jurisdictional scheme governing actions against the United States often requires . . . plaintiffs to file two actions in different courts[.] [A]n action seeking injunctive relief to set aside an agency action must proceed in district court, but a claim that the same agency action constitutes a taking of property requiring just compensation must proceed in the [United States Court of Federal Claims]." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 323 (2011) (Sotomayor, J., concurring); *see also E. Enters.*, 524 U.S. at 521 ("[T]he Declaratory Judgment Act allows individuals threatened with a taking to seek a declaration

of the constitutionality of the disputed governmental action *before* potentially uncompensable damages are sustained[.]") (italics added) (internal quotation marks and citation omitted)). Therefore, without "a clearly expressed congressional intention to the contrary, [the court must] reward each [statute] as effective." *Blanchette*, 419 U.S. at 134.

For these reasons, the court has determined that PROMESA does not preempt Tucker Act jurisdiction, because it did not contain either a comprehensive remedial scheme or monetary relief equivalent to "just compensation."

### 3.     The Oversight Board Is An Entity Of The Federal Government.

Congress authorized the United States Court of Federal Claims with jurisdiction to adjudicate claims filed against the United States that are "founded[,] either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The United States Supreme Court has held that the court's "jurisdiction is confined to the rendition of money judgments in suits brought for that relief against the United States[.]" *See United States v. Sherwood*, 312 U.S. 584, 588 (1941); *see also Testan*, 424 U.S. at 397–98 ("[T]he Court of Claims was established by Congress in 1855 [and] throughout its entire history . . . its jurisdiction has been limited to money claims against the United States Government[.]") (internal quotation marks and corrections omitted).

The text of PROMESA provides that the Oversight Board is an entity of the Commonwealth, but specified that it "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." 48 U.S.C. § 2121(c). Statements made by Congress during the passage of PROMESA, however, refer to the Oversight Board as a "federal oversight board."[15]   In addition, the House Report on PROMESA directed the Congressional Budget Office to "treat the Oversight Board as a federal entity[,] because of the 'significant degree of federal control involved in [the Oversight Board's] establishment and operations.'" H.R. Rep. No. 114-602 at 72. Although this legislative history is relevant in determining whether the Oversight Board is a federal entity, the court does not need to rely on legislative history, because established precedent is dispositive of this threshold issue.

In *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), the United States Supreme Court agreed to decide whether the Rail Passenger Service Act of 1970, 45 U.S.C. § 541 (1988), that states Amtrak "will not be an agency, instrumentality, authority, entity, or establishment of the United States Government," was controlling in determining whether Amtrak was an entity of the federal government, where a constitutional claim was in issue. *Id.* at 374. Therein, the Court held that Congress can determine the status of an entity only "for purposes of matters that are

---

[15] *See, e.g.*, 162 CONG. REC. S4699, S4700 (daily ed. June 29, 2016 (statement of Sen. Cornyn)); *see also Discussion Draft, H. R., "Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA)": Hearing Before the H. Comm. on Natural Resources*, 114th Cong. 56-59 (2016) (statement of Rep. Pierluisi); 162 CONG. REC. S1848, S1849 (daily ed. Apr. 11, 2016) (statement of Sen. Inhofe); *The Need for Establishment of a Puerto Rico Financial Stability and Economic Growth Authority Oversight Hearing Before the H. Comm. on Natural Resources,* 114th Cong. 43 (2016) (statement of Rep. Pierluisi).

within Congress's control[.]" *Id.* at 392.  In other words, "it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions." *Id.*  This principle was re-affirmed in *Dep't of Transp. v. Ass'n of Am. R.R.s*, 135 S. Ct. 1225, 1233 (2015) (holding that, where a constitutional claim is at issue, "the practical reality of federal control and supervision prevails over Congress' disclaimer.").  Therefore, when a constitutional claim is lodged against an alleged federal entity, the court must determine: (1) whether the entity was created by "special law;" (2) whether the entity was established "for the furtherance of governmental objectives;" and (3) whether the federal government "retaine[d] for itself permanent authority to appoint a majority of the directors." *See Lebron*, 513 U.S. at 400.

Since the October 31, 2017 Amended Complaint alleges a claim under the Takings Clause of the Fifth Amendment of the United States Constitution, the court first must determine whether the Oversight Board was created by "special law."  In *Lebron*, the Court held that the Railway Passenger Service Act of 1970 was a "special law," because it decided the incorporation, structure, powers, and procedures for Amtrak to achieve the purpose of the statute.  *Id.* at 397 ("Amtrak was created by a special statute[.]"); *see also Special Law*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A statute that pertains to and affects a particular case, person, place, or thing, as opposed to the general public.").

On June 30, 2016, Congress enacted PROMESA to establish an Oversight Board, "to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  48 U.S.C. § 2121(a).  The structure and authority of the Oversight Board was set forth in great detail.  *See, e.g.*, 48 U.S.C. §§ 2121(e) (appointment of Oversight Board members), 2121(h) (adoption of bylaws for conducting business of the Oversight Board), 2123 (establishing an Executive Director and staff), 2124 (powers of the Oversight Board), 2141–2152 (responsibilities of the Oversight Board), and 2175 (role and capacity of the Oversight Board).  These provisions demonstrate that PROMESA includes all of the hallmarks of a "special law," *i.e.*, structure, powers, and procedures to achieve the special purpose of providing a "method" for the Commonwealth "to achieve fiscal responsibility and access to the capital markets." *Id.* § 2121(a).

Therefore, the court has determined that PROMESA is a "special law" for purposes of determining whether the Oversight Board is a federal entity.  *See Lebron*, 513 U.S. at 400.

In addition, the court must determine whether the Oversight Board was established "for the furtherance of governmental objectives." *Id.* at 400.  In *Lebron*, the "furtherance of governmental objectives" was evidenced by "the long history of corporations created and participated in by the United States for the achievement of governmental objectives." *Id.* at 386–91.  Specific examples cited included government corporations established during the Great Depression, "primarily directed to stabilizing the economy and to making distress loans to farms, homeowners, banks, and other enterprises." *Id.* at 388.  The Reconstruction Finance Corporation also was cited, because it "initially authorized to make loans to banks, insurance companies, railroads, land banks, and agricultural credit organizations, including loans secured by the assets of failed banks." *Id.* Another example was the Federal Deposit Insurance Corporation, "established to hold and liquidate the assets of failed banks, and to insure bank deposits." *Id.*

The United States Constitution authorized Congress with the responsibility of "dispos[ing] of and mak[ing] all needful Rules and Regulations" for territories.  U.S. CONST. art. IV, § 3, cl. 2; 48 U.S.C. §§ 2121(b)(1)–(2).   Because the United States Supreme Court struck down the Commonwealth's attempt to enact debt-restructuring laws, to avoid dealing directly with its fiscal situation in *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1942 (2016), Congress enacted PROMESA to establish the Oversight Board to achieve the "governmental objective" of providing "a method for a covered territory to achieve fiscal responsibility and access to the capital markets" by approving a fiscal plan and budget for the Commonwealth.  *See* 48 U.S.C. § 2121(a); *see also id.* §§ 2141, 2142.   The Oversight Board also was responsible for ensuring that the Commonwealth complied with the fiscal plan and made recommendations to ensure the Commonwealth's financial stability and management responsibility.  *See id.* §§ 2144–2145.   The import of these directives by Congress were emphasized in PROMESA, as follows: "For so long as the Oversight Board remains in operation, no territorial government may, *without the prior approval of the Oversight Board, issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt.*"  *Id.* § 2147 (italics added).

Therefore, the court has determined that PROMESA was enacted by Congress for a "governmental objective," *i.e.*, stabilizing the Commonwealth's fisc.  *See Lebron*, 513 U.S. at 398 (holding that "Amtrak is not merely in the temporary control of the Government . . . ; it is established and organized under federal law for the very purpose of pursuing federal governmental objectives[.]").

Next, the court must determine whether the United States "retaine[d] for itself permanent authority to appoint a majority of the directors."  *Lebron*, 513 U.S. at 400.  The authorizing statute in *Lebron* required that six of Amtrak's eight directors be appointed directly by the President, but

> the statute restricts most of the President's choices to persons suggested by certain organizations or persons having certain qualifications, those restrictions have been tailor-made by Congress for this entity alone.  They do not in our view establish an absence of control by the Government as a whole, but rather constitute a restriction imposed by one of the political branches upon the other.

*Id.* at 397–98.

Likewise, PROMESA required that an Oversight Board be formed, "consist[ing] of seven members appointed by the President who meet the qualifications described in subsection (f)[16] and

---

[16] This section provides:

An individual is eligible for appointment as a member of the Oversight Board only if the individual (1) has knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government; and (2) prior to appointment, an individual is not an officer, elected official, or employee of the territorial government, a candidate for elected office of the territorial government, or a former elected official of the territorial government.

48 U.S.C. §§ 2121(f)(1)–(2).

mode

section 2129(a)[17] of this title." 48 U.S.C. § 2121(e)(1)(A).  PROMESA also directed the President to select the seven members only lists of candidates recommended by Congress.  *See* 48 U.S.C. § 2121(e)(2).  Although the Commonwealth's Governor was a member of the Oversight Board, the Governor was a non-voting, *ex officio* member.  *See* 48 U.S.C. § 2121(e)(3) ("The Governor, or the Governor's designee, shall be an *ex officio* member of the Oversight Board without voting rights.") (italics added).  In addition, Oversight Board members were removable only by the President, "for cause."  *See* 48 U.S.C. § 2121(e)(5)(B).

Therefore, the court has determined that, in PROMESA, Congress "retaine[d] for itself permanent authority to appoint a majority of the directors."  *Lebron*, 513 U.S. at 400.

The Government relies on the fact that the Oversight Board has wide discretion in the day-to-day operations of the Commonwealth and no federal officials sit *ex officio*, as evidence that the Oversight Board is not a "federal entity."  Gov't Mot. at 21–23.  Plaintiffs respond that the Government "does not explain how or why any of these aspects are more relevant to Federal control than the fact that the President has the exclusive power to appoint *all* the voting members [of the Oversight Board] and can remove them for cause."  Pl. Resp. at 12 (italics in original).  The Government also asserts that the Oversight Board is not part of the United States Government, because the costs are paid for with Commonwealth funds.  Gov't Mot. at 21–22.  The United States Supreme Court, however, has considered federal funding as only one of many indicia of federal control.  *See Ass'n Am. R.Rs.*, 135 S. Ct. at 1231–32 (discussing funding as one among other considerations to determine whether Amtrak is a federal entity).  More importantly, federal control is evident, because Congress retained the right to terminate the Oversight Board, if certain conditions are met.  *See* 48 U.S.C. § 2149.[18]  Therefore, the Oversight Board does not exercise the

---

[17] This section provides:

Notwithstanding any ethics provision governing employees of the covered territory, all members and staff of the Oversight Board shall be subject to the Federal conflict of interest requirements[.]

48 U.S.C. § 2129(a).

[18] This Section provides that:

An Oversight Board shall terminate upon certification by the Oversight Board that

(1) the applicable territorial government has adequate access to short-term and long-term credit markets at reasonable interest rates to meet the borrowing needs of the territorial government; and

(2) for at least 4 consecutive fiscal years--

    (A) the territorial government has developed its Budgets in accordance with modified accrual accounting standards; and

type of "temporary" control discussed in *Lebron*.  513 U.S. at 399 (holding that where company's stock could temporarily come under federal ownership, and when "[t]he Government [was] exert[ing] its control . . . as a policymaker," no federal control was evidenced).  In this case, the Oversight Board was created and empowered by Congress not to make policy, but to dispose of and make all needful rules and regulations "to achieve fiscal responsibility and access to the capital markets."  48 U.S.C. § 2121(a).

The Government seeks to avoid the precedential effects of *Lebron* by arguing that PROMESA was enacted, pursuant to Congress' Article IV plenary authority over the territories. Gov't Mot. at 18–21.  In *Lebron*, the United States Supreme Court considered the source of Congress' authority in enacting the Rail Passenger Service Act of 1970, but determined that the issue of federal control must be determined based on "practical reality."  *See Ass'n Am. R.Rs.*, 135 S. Ct. at 1233 ("*Lebron* teaches that, for purposes of [the entity's] status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress' disclaimer of [the entity's] governmental status.").  Certainly, Congress has authority to determine which constitutional provisions or federal law apply in the territories. *See Torres v. Puerto Rico*, 442 U.S. 465 (1979) (holding that "the constitutional requirements of the Fourth Amendment apply to the Commonwealth.").  But, the United States Supreme Court has held that "fundamental" constitutional rights apply in the territories.  *See Dorr v. United States*, 195 U.S. 138, 146 ("Congress, in legislating for the territories, [is] subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments[.]").  Therefore, even though Congress has "broad latitude" in matters of territorial governance; *that authority* does not supplant the role of federal courts in protecting fundamental constitutional rights.  *See Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1876 (2016) (holding that Congress has no capacity "to rewrite its own foundational role").

As an aside, the Government adds that, because the United States Court of Federal Claims is a legislative, not constitutional, court Congress can determine whether the Oversight Board is a federal entity for purposes of the court's jurisdiction.  Gov't Mot. at 15–18.  The Government, however, confuses the issue of whether the Oversight Board is a federal entity for purposes of Fifth Amendment Takings Clause claim, that *Lebron* governs, with the separate issue of jurisdiction and venue, that the Tucker Act governs.  In this case, the Takings Clause claim is alleged against the Oversight Board, as a federal entity; therefore, Congress authorized the United States Court of Federal Claims with jurisdiction to adjudicate that claim.  *See* 28 U.S.C. § 1491.

More importantly, the United States Constitution, Article I, Section 8, provides, in part, that "[t]he Congress shall have Power To . . . constitute Tribunals inferior to the Supreme Court." U.S. CONST. art. I, § 8.  Article III, Section 1 further provides that "[t]he judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish."  U.S. CONST. art. III, § 1.  Exercising its constitutional

---

(B) the expenditures made by the territorial government during each fiscal year did not exceed the revenues of the territorial government during that year, as determined in accordance with modified accrual accounting standards.

48 U.S.C. § 2149.

grant of power, Congress established the Court of Claims and its successor courts, with "limited jurisdiction," as is the case with *all* other federal courts. There is nothing "specialized" about the court's jurisdiction. *See Glidden Co. v. United States*, 370 U.S. 530, 582 (1962) (explaining that the Court of Claims was not a "tribunal" where "a substantial and integral part of whose business is nonjudicial"). Indeed, as the Supreme Court emphasized, "[t]he overwhelming majority of the Court of Claims' business is composed of cases and controversies." *Id.* at 583. That was true in 1962, and remains so today.

For all of the aforesaid reasons, the court has determined the Takings Clause claim alleged in the October 31, 2017 Amended Complaint is not an action against the Oversight Board; instead, it is an action against the United States. *See Acceptance Ins.*, 503 F.3d at 1337 ("A [T]akings [Clause] claim is properly brought against the United States, not against the agent whose actions give rise to the claim.").

\*     \*     \*

On June 21, 2018, the United States Supreme Court issued a decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018), that held certain administrative law judges ("ALJs") were "Officers of the United States," under Article II, Section 2, Clause 2, because they "hold a continuing office established by law." *Lucia*, 138 S. Ct. at 2047; *see also Freytag v. C.I.R.*, 501 U.S. 868, 881 (1991) (holding that "[t]he office of special trial judge is established by [l]aw . . . and the duties, salary, and means of appointment for that office are specified by statute.") (internal quotation marks omitted). In this case, Oversight Board members hold a continuing office established by Congress that specifies their "duties . . . and means of appointment." *Freytag*, 501 U.S. at 881; *see also* 48 U.S.C. §§ 2121–2129. Similarly to the ALJs in *Lucia*, Oversight Board members exercise "significant discretion" in carrying out their "important functions." *Lucia*, 138 S. Ct. at 2053 (quoting *Freytag*, 501 U.S. at 882). Although the special trial judges in *Freytag* and the ALJs in *Lucia* were engaged in different and much more limited duties than those exercised by Oversight Board members, there is little doubt that the latter are also "federal civil officials 'with responsibility for an ongoing statutory duty.'" *Lucia*, 138 S. Ct. at 2056 (Thomas, J., concurring) (quoting *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 946 (2017) (Thomas, J., concurring); *see also Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1362 (Fed. Cir. 2005) ("There is no question that the United States, in general, incurs takings liability for the acts of its agents. That is, a takings claim against the United States may be based on the acts of an agent of the United States.") (internal quotation marks omitted).

The separate issue of whether the Oversight Board members' manner of appointment violates Article III, Section 2, Clause 2, is presently pending before the United States District Court for the District of Puerto Rico in two separate lawsuits. *See* Objection And Motion Of Aurelius To Dismiss Title III Petition, *In re The Financial Oversight and Management Board for Puerto Rico*, No. 17-03283-LTS (D.P.R. Aug. 7, 2017), Dkt. No. 913; *see also* First Amended Adversary Complaint, *Union de Trabajadores de la Industria Electrica y Riego v. Puerto Rico Elec. Power Auth.*, No. 17-228, Dkt. No. 75 (D.P.R. Nov. 10, 2017). In the event that the United States District Court for the District of Puerto Rico determines that it does, the "appropriate remedy" may render the actions of the Oversight Board alleged in the October 31, 2017 Amended Complaint unlawful and require restoration or restitution of the Pledged Property that served as collateral for the ERS bonds owned by Plaintiffs.

25

Therefore, the court has determined that the Government's 28 U.S.C. § 1500 challenge and alternative motion to dismiss the October 31, 2017 Amended Complaint, pursuant to RCFC 12(b)(6), are not ripe. Accordingly, the interests of justice require that this case be stayed, at least until a decision and final judgment is entered in each of the above-referenced cases: *In re The Financial Oversight and Management Board for Puerto Rico*, No. 17-03283-LTS; and *Union De Trabajadores De La Industria Electrica Y Riego v. Puerto Rico Electric Power Authority*, No. 17-228.[19]

## IV.   CONCLUSION.

For all of the aforesaid reasons, the Government's December 8, 2017 Motion To Dismiss, pursuant to RCFC 12(b)(1), is denied. The above-captioned case is stayed at least until a decision and final judgment is entered in each of the above-referenced cases. In addition, the parties are directed to file a joint status report within thirty days after the United States District Court for the District of Puerto Rico issues a decision and final judgment in each of those cases.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**

---

[19] On July 6, 2018, at the request of the court, the parties filed a Joint Submission summarizing proceedings currently pending in the United States District Court for the District of Puerto Rico concerning PROMESA. The court attached the July 6, 2018 Joint Submission to this Memorandum Opinion And Order to provide additional background and context for the decision to stay this case in deference to the jurisdiction of the United States District Court for the District of Puerto Rico over the cases cited above.

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
--------------------------------------------------------------------X
ALTAIR GLOBAL CREDIT OPPORTUNITIES        )
FUND (A), LLC, ANDALUSIAN GLOBAL          )
DESIGNATED ACTIVITY COMPANY, GLENDON )
OPPORTUNITIES FUND, L.P., MASON CAPITAL   )        No. 17-970
MASTER FUND LP, NOKOTA CAPITAL MASTER )
FUND, L.P., OAKTREE-FORREST MULTI-        )        Chief Judge Braden
STRATEGY, LLC (SERIES B), OAKTREE         )
OPPORTUNITIES FUND IX, L.P., OAKTREE      )
OPPORTUNITIES FUND IX (PARALLEL 2), L.P., )
OAKTREE VALUE OPPORTUNITIES FUND, L.P., )
OCHER ROSE, L.L.C., AND SV CREDIT, L.P.,  )
                                          )
                 Plaintiffs,              )
                                          )
              -against-                   )
                                          )
THE UNITED STATES OF AMERICA,             )
                                          )
                 Defendant.               )
                                          )
--------------------------------------------------------------------X
```

## JOINT SUBMISSION OF PLAINTIFFS AND THE UNITED STATES

# TABLE OF CONTENTS

Page

I. PROCEEDINGS INVOLVING PLAINTIFFS ................................................1

   A. Altair Global Credit Opportunities Fund (A), L.L.C., et al. v.
      Garcia-Padilla, No. 16-cv-2696 (D.P.R. Sept. 21, 2016) ...................................1

   B. Altair Global Credit Opportunities Fund (A), L.L.C. v.
      Garcia-Padilla, No. 16-2433 (1st Cir. 2016) ...............................................3

   C. ERS Bondholders' Adequate Protection Motion in ERS Title III Case,
      In re FOMB ex rel. ERS, No. 17-3566 .......................................................6

   D. Altair Global Credit Opportunities Fund (A), L.L.C., et al. v.
      United States, No. 17-970 (Fed. Cl. July 19, 2017) .......................................8

   E. FOMB ex rel. ERS v. Altair Global Credit Opportunities Fund (A), LLC,
      et al., Adv. Proc. No. 17-213 (D.P.R. July 21, 2017) .....................................8

   F. Altair Global Credit Opportunities Fund (A), L.L.C., et al. v.
      Commonwealth of Puerto Rico et al., Adv. Proc. Nos. 17-219 and 17-220
      (D.P.R. July 27, 2017) .........................................................................11

   G. ERS Bondholders' Adequate Protection Motion in ERS Title III Case and
      Commonwealth Title III Case,
      In re FOMB ex rel. ERS, No. 17-3566
      In re FOMB ex rel. Commonwealth of Puerto Rico, No. 17-3283 ......................15

II. PROCEEDINGS INVOLVING OTHER PARTIES ......................................16

   A. The Puerto Rico Funds' Motion in ERS Title III Case,
      In re FOMB ex rel. ERS, No 17-3566 ......................................................16

   B. Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.,
      Adv. Proc. No. 17-159 (D.P.R. June 8, 2018) .............................................16

   C. ACP Master LTD., et al. v. Commonwealth of Puerto Rico et al.,
      Adv. Proc. No. 17-189 (D.P.R. June 28, 2017) ...........................................18

   D. The Appointments Clause Litigation: UTIER v. Puerto Rico Electric
      Power Authority, et al. (Adv. Proc. No. 17-228) and Aurelius' Motion to
      Dismiss Commonwealth Title III Petition
      (Dkt. No. 913 in Case No. 17-3283) .........................................................20

   E. FOMB v. Hon. Ricardo Antonio Roselló, Adv. Proc. No. 17-250 (D.P.R.) ....................24

   F. Oversight Board's Motion for Appointment of Chief Transformation
      Officer in PREPA Title III Case, In re FOMB ex rel. PREPA, No. 17-4780 ...................26

   G. Pinto Lugo v. United States, Adv. Proc. No. 18-041
      (D.P.R. April 24, 2018) ........................................................................27

   H. Assured Guaranty Corp. v. Commonwealth of Puerto Rico,
      Adv. Proc. No. 18-059 (D.P.R. May 23, 2018) ...........................................28

I.   Hermandad de Empleados del Fondo del Seguro del Estado v. United
     States, Adv. Proc. No. 18-066 (D.P.R. May 30, 2018)......................................................29

J.   Hon. Ricardo Antonio Rosselló *et al.* v. FOMB
     Adv. Proc. No. 18-080 (D.P.R.)…………………………………………………………..30

In accordance with this Court's request, Plaintiffs and the United States provide the following joint submission.[1]

1.      Plaintiffs allege that they are owners of secured bonds (the "ERS Bonds") issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") in 2008.

2.      On June 30, 2016, Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016), *codified at* 48 U.S.C. § 2101, *et seq.* A stated purpose of PROMESA is to "establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes." H.R. 5278, 114th Cong. (2016) (preamble).

## I.      PROCEEDINGS INVOLVING PLAINTIFFS

### A. Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. García-Padilla, No. 16-cv-2696 (D.P.R. Sept. 21, 2016)

3.      PROMESA's enactment, on June 30, 2016, triggered an interim stay of certain creditor remedies against the Commonwealth and its instrumentalities. On September 21, 2016, Plaintiffs, together with other holders of the ERS Bonds (collectively, the "ERS Bondholders" or the "Bondholders"), filed a motion in the United States District Court for the District of Puerto

---

[1] The parties have endeavored to identify and summarize proceedings relating to the Puerto Rico restructuring actions that are germane to the Court's request. However, there are numerous ongoing proceedings that we have not included. Because the United States is not a party to many of the district court actions described below, the Government can only represent what has been stated by the various parties in their publicly available filings, and cannot vouch for the accuracy of those parties' statements. Although the parties have attempted to summarize the various filings at issue in these proceedings, the documents themselves—which are separately being provided to the Court—are the best reflection of their contents. This document has been prepared for informational purposes at the Court's request and should not be regarded as an admission by either party. Furthermore, the filing of this document does not constitute a waiver of any argument that has or will be made by Plaintiffs or the United States.

Rico to lift the initial PROMESA stay for "cause shown," unless ERS and the Commonwealth provided adequate protection. *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. García-Padilla*, No. 16-cv-2696, Dkt. No. 1 (D.P.R. Sept. 21, 2016). PROMESA, 48 U.S.C. § 2194(e) provides that a court shall grant relief from the stay for "cause shown," and the ERS Bondholders argued that they satisfied this requirement because they lacked adequate protection of their property interests. The Bondholders alleged that ERS and the Commonwealth had refused to provide adequate protection, and that the value of their liens would inevitably decline as a result of actions by ERS and the Commonwealth.

4.     On October 26, 2016, ERS opposed the motion. *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. García-Padilla*, No. 16-cv-2696, Dkt. No. 52 (D.P.R. Oct. 26, 2016). ERS argued that the motion violated due process because Plaintiffs had filed a motion and not a complaint against ERS, and ERS was given little notice before a hearing was scheduled. ERS also argued that the Bondholders were adequately protected because reserve accounts held by the ERS Fiscal Agent had adequate funds to make principal and interest payments on the ERS Bonds during the PROMESA stay. ERS stated that "under the clear terms of the [ERS] Bond Resolution, the [ERS Bondholders] have valid and enforceable liens over hundreds of millions of dollars of ERS revenue, which will continue to grow." *Id.* at 10. ERS also argued that the lack of adequate protection is not "cause" to lift the PROMESA stay and that the Fifth Amendment does not mandate lifting the stay where adequate protection has not been provided. The Commonwealth opposed the motion on the same grounds. *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. García-Padilla*, No. 16-cv-2696, Dkt. No. 53 (D.P.R. Oct. 26, 2016).

5.     On October 28, 2016, the Financial Oversight & Management Board for Puerto Rico (the "Oversight Board") sought to intervene in the proceedings.  On November 1, 2016 the district court (J. Besosa) denied the motion to intervene without prejudice.

6.     On November 2, 2016, the district court issued an opinion denying the ERS Bondholder's motion to lift the PROMESA automatic stay.  While the district court held that a lack of adequate protection could satisfy PROMESA's "cause" requirement, the court concluded that the Bondholders were adequately protected for the duration of the initial PROMESA stay. *Peaje Invs. LLC v. Garcia-Padilla*, No. 16-2365, 2016 U.S. Dist. LEXIS 153711, at \*23-\*25 (D.P.R. Nov. 2, 2016).  The court found that the Bondholders "pursuant to the terms of the applicable bond resolution, hold a security interest and lien in certain pledged property, including all future employer contributions," which "continues indefinitely until ERS's outstanding debt obligations have been satisfied in full." *Id.* at \*23-\*24.  The court went on to state that "nothing in the language of PROMESA or [a particular Commonwealth law at issue] diminishes or destroys this lien against the ERS employer contributions," which "are a perpetual revenue stream . . . " *Id.*

B.  Altair Global Credit Opportunities Fund (A), L.L.C.  v  Garcia-Padilla,
    No. 16-2433 (1st Cir. 2016)

7.     On November 28, 2016, the ERS Bondholders appealed the district court's order denying their motion to lift the PROMESA automatic stay.  On December 12, 2016 the ERS Bondholders filed their opening brief.  The Bondholders argued that their lien on future employer contributions was not a suitable form of adequate protection because secured creditors are entitled to adequate protection in the form of a substitute of the most indubitable equivalence and payment tomorrow is not the equivalent of payment today.  Opening Brief for Appellants, No. 16-2433 (1st Cir. Dec. 12, 2016).  The Bondholders also argued that a promise of future payment does not constitute adequate protection where the secured creditor already has a lien on those very

3

payments.  *Id.*  Finally, the Bondholders noted that ERS and the Commonwealth had stated publicly that future employer contributions were uncertain.  *Id.*

8.    On December 23, 2016, ERS and the Commonwealth filed briefs arguing that the appeal should be dismissed for lack of jurisdiction because the district court's order was not final, or alternatively that the district court's order should be affirmed.  ERS and the Commonwealth challenged the district court's finding that the lack of adequate protection could constitute "cause" to lift the PROMESA stay.  They also argued that the ERS Bondholders were adequately protected because they had a lien of "indefinite duration" and had "access to the full revenue stream of the ERS."  Brief for Respondent-Appellee ERS at 30, No. 16-2433 (1st Cir. Dec. 23, 2016); Brief for Respondents-Appellees Garcia-Padilla, Zaragoza-Gomez, Cruz-Batista, and Villar-Prados, No. 16-2433 (1st Cir. Dec. 23, 2016).

9.    The Oversight Board filed an amicus brief supporting affirmance and described the ERS Bondholders' lien as a "perpetual, replenishing revenue stream[]."  Brief of Amicus Curiae Oversight Board in Support of Respondents-Appellees, No. 16-2433 (1st Cir. Dec. 23, 2016).

10.    After argument, the First Circuit vacated the district court's denial of the Bondholders' motion and remanded the case.  *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 509 (1st Cir. 2017).  The court first found that it had jurisdiction over the appeal because the district court's denial of the motion to lift the automatic stay was a final decision.  The court next held that "the lack of adequate protection for creditors constitutes cause to lift the PROMESA stay," reasoning that even "prior to the enactment of the current bankruptcy stay provision, the Supreme Court had recognized that creditors are constitutionally entitled to protection to the extent of the value of their property."  *Id.* at 511-512.  The First Circuit also observed that it "doubt[ed] the

constitutionality" of any action that would "expend every penny of [the ERS Bondholders'] collateral, leaving the debt entirely unsecured." *Id.*

11.     The court held that the Bondholders were entitled to a hearing on the question of adequate protection based on statements by ERS regarding the uncertainty of future employer contributions. *Id.* at 514. The court noted that ERS attempted to avoid such a hearing "by citing a joint stipulation filed in the district court reflecting ERS's representation that the allegedly diverted employer contributions are currently being held in an operating account." *Id.* The First Circuit observed that "[t]he parties, however, dispute whether the Altair Movants' lien extends to this account. If it does not, the Altair Movants face the prospect of being left with a mere unsecured claim." *Id.* "Because the district court made no finding as to whether the Altair Movants' lien extends to the operating account, and the parties have not briefed the issue on appeal," the First Circuit "decline[d] to address this question in the first instance." *Id.*

12.     The First Circuit also held that the district court applied an overly technical standard in denying the Oversight Board's motion for intervention. *Id.* at 515. The court remanded for the district court to apply the correct standard and noted that PROMESA appears to grant the Board the right to intervene. *Id.* at 516.

13.     Following the First Circuit's decision, the ERS Bondholders, the Commonwealth, ERS, and the Oversight Board entered into a stipulation in January 2017 to settle the Bondholders' request for adequate protection. The parties retained all rights, remedies, and claims. *See* Order Approving Stipulation, No. 16-cv-2696, Dkt No. 83 (D.P.R. Jan. 17, 2017). The parties entered into another stipulation in April 2017. Joint Stipulation and Order, No. 16-cv-2696, Dkt No. 86 (Apr. 11, 2017). That stipulation also noted that the parties retained all rights, remedies, and

claims, and noted that nothing in the stipulation or order operated to waive whatever rights the parties have pursuant to Title III of PROMESA, if a Title III proceeding were to be commenced.

C. ERS Bondholders' Adequate Protection Motion in ERS Title III Case,
   In re FOMB ex rel. ERS, No 17-3566

14.     On May 3, 2017, the Oversight Board filed a Title III petition for the Commonwealth.  Chief Justice Roberts then exercised his authority under PROMESA to designate the Honorable Laura Taylor Swain, United States District Judge for the Southern District of New York, as the presiding judge in the Commonwealth's Title III case in the United States District Court for the District of Puerto Rico.

15.     On May 21, 2017, the Oversight Board filed a Title III petition for ERS.  The filing of that petition triggered the automatic stay provisions of the Bankruptcy Code.  11 U.S.C. § 362; 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 362 into PROMESA).

16.     On May 31, 2017, the ERS Bondholders filed a motion in ERS's Title III case seeking to lift the automatic stay or, in the alternative, for adequate protection.  The ERS Bondholders alleged that ERS had refused to provide adequate protection upon the Bondholders' request. *In re FOMB ex rel. ERS*, No 17-3566, Dkt. No. 26 (D.P.R. May 31, 2017).[2]  The ERS Bondholders argued that they hold constitutionally-protected liens in property of ERS, that those liens remained valid and enforceable after ERS's Title III filing, and that those liens were not adequately protected.

17.     The Oversight Board opposed the motion.  *In re FOMB ex rel. ERS*, No 17-3566, Dkt. No. 98 (D.P.R. June 21, 2017).  The Board argued that the Bondholders' liens were not

---

[2] The docket entries filed in the PROMESA Title III cases can be obtained through the United States Bankruptcy Court for the District of Puerto Rico electronic filing system via PACER at https://ecf.prb.uscourts.gov/.

perfected because the relevant Uniform Commercial Code financing statements were defective and, in any event, that § 552 of the Bankruptcy Code retroactively terminated the Bondholders' prepetition liens.[3]  The Board also argued that the automatic stay should nonetheless remain in effect because the Bondholders' property interests were adequately protected.

18.    The ERS Bondholders filed a reply brief.  *In re FOMB ex rel. ERS*, No 17-3566, Dkt. No. 127 (D.P.R. June 25, 2017).  The Bondholders argued that they have valid liens that were perfected by the filing of financing statements in 2008, 2015, and 2016.  The Bondholders also argued that § 552 is inapplicable to their lien and that they were entitled to adequate protection because, based upon statements made by Commonwealth officials, it appeared that their property interests were diminishing in value.

19.    The court heard argument on the motion on June 28, 2017.

20.    On July 14, 2017, the parties entered into a stipulation as to adequate protection. *In re FOMB ex rel. ERS*, No 17-3566, Dkt. No. 170 (D.P.R. July 14, 2017).  The joint stipulation stated that ERS would provide the ERS Bondholders with certain protections, including (1) the payment of current interest due on the ERS Bonds from a segregated account established pursuant to a prior stipulation entered on January 17, 2017 (*see supra* ¶ 13), and (2) monthly deposits of $18.5 million from June through October 2017 into a newly-created segregated account.  The stipulation also required that ERS file an adversary proceeding regarding "the validity, priority,

---

[3] Section 552(a) of the Bankruptcy Code provides a general rule that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a).  But § 552(b)(1) provides an exception that where a prepetition lien extends to "property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property," then the lien also "extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law." *Id.* § 552(b)(1).

extent and enforceability of the prepetition and postpetition liens and security interest asserted by the Bondholders with respect to the ERS Bonds" and permitted the Bondholders to file a counterclaim respecting the same.  *In re FOMB ex rel. ERS*, No 17-3566, Dkt. No. 170 (D.P.R. July 14, 2017) at 3.

21.    On July 17, 2017, the Court approved the stipulation and resolved the ERS Bondholders' motion, while "retain[ing] jurisdiction over any and all matters arising from or related to the implementation or interpretation of the Stipulation or th[e] Order."  *In re FOMB ex rel. ERS*, No 17-3566, Dkt. No. 171 (D.P.R. July 17, 2017).

D.   Altair Global Credit Opportunities Fund (A), LLC, et al. v. United States,
No. 17-970 (Fed. Cl. July 19, 2017)

22.    On July 19, 2017, Plaintiffs commenced the current action against the United States in this Court for just compensation under the Fifth Amendment.

E.   FOMB ex rel. ERS v. Altair Global Credit Opportunities Fund (A), LLC, et
al., Adv. Proc. No. 17-213 (D.P.R. July 21, 2017)

23.    On July 21, 2017, the Oversight Board initiated an adversary proceeding on behalf of ERS.  *FOMB ex rel. ERS v. Altair Global Credit Opportunities Fund (A), LLC, et al.*, Adv. Proc. No. 17-213, Dkt. No. 1 (D.P.R. July 21, 2017).   The parties filed cross motions for summary judgment.

24.    The Oversight Board raised a number of arguments in its motion.  *FOMB ex rel. ERS v. Altair Global Credit Opportunities Fund (A), LLC, et al.*, Adv. Proc. No. 17-213, Dkt. No. 91 (D.P.R. Nov. 3, 2017).  *First*, the Board argued that the ERS Bondholders' liens were never perfected because the UCC financing statements filed by ERS were defective, and therefore any purported security interests were invalid and unenforceable against ERS pursuant to § 544(a) of the Bankruptcy Code, which was made applicable to the Title III proceedings by PROMESA.

*Second*, assuming the Bondholders hold perfected liens, the Board argued that those liens do not cover employee loans or funds received by ERS on account of employee loans. *Third*, the Board argued that even if the ERS Bondholders held perfected liens prior to ERS's Title III petition date, § 552 of the Bankruptcy Code (made applicable to Title III proceedings by PROMESA) terminated those liens and prevented them from attaching to any ERS property obtained after the petition date. The Board also argued that no exception to § 552 was applicable. *Fourth*, the Oversight Board argued that ERS had complied with its obligations under the stipulation entered on January 17, 2017 (*see supra* ¶ 13).

25.     The ERS Bondholders opposed the Oversight Board's motion. *FOMB ex rel. ERS v. Altair Global Credit Opportunities Fund (A), LLC, et al.,* Adv. Proc. No. 17-213, Dkt. No. 120 (D.P.R. Nov. 15, 2017). *First*, the Bondholders argued that they hold perfected liens and security interests in ERS property because the relevant financing statements are valid and did not lapse. The Bondholders further argued that even if unperfected, their liens are valid because no other creditor has an interest in the collateral and ERS cannot use § 544 of the Bankruptcy Code to avoid the liens.[4] *Second*, the Bondholders argued that they have a valid, perfected, and enforceable lien on employee loans. *Third*, the ERS Bondholders argued that § 544 and § 552 of the Bankruptcy Code does not terminate or otherwise limit their valid liens and, if either provision were interpreted to do so, it would trigger Takings Clause issues. *Fourth*, the Bondholders argued that ERS violated the January 2017 stipulation (*see supra* ¶ 13).

---

[4] Section 544(a) of the Bankruptcy Code vests trustees and debtors in possession with the power to avoid an unperfected, but otherwise valid security interest when another creditor could possess an interest that is superior to that of the unperfected creditor, whether or not such a superior creditor actually exists.  11 U.S.C. § 544(a).

26.     On November 22, 2017, the Oversight Board reinforced its arguments in reply, and the parties raised similar arguments in the ERS Bondholders' motion for summary judgment. *FOMB ex rel. ERS v. Altair Global Credit Opportunities Fund (A), LLC, et al.*, Adv. Proc. No. 17-213, Dkt. Nos. 94, 115, 149, 150 (D.P.R.).  The court heard oral argument on the parties' motions on December 13, 2017.

27.     On March 12, 2018, the court ordered supplemental briefing on certain issues.  The parties filed supplemental briefs and reply briefs on March 21, 2018, and March 23, 2018.

28.     In their supplemental briefs (No. 17-213, Dkt. Nos. 199, 206), the ERS Bondholders addressed three issues.  *First*, they argued that under § 544 of the Bankruptcy Code, no hypothetical creditor could possess a judicial lien on any assets of the ERS because of Puerto Rico Act 66-2014, which prohibits creditors from acquiring liens on property of Commonwealth-related entities.  *Second*, the Bondholders argued that employers are obligated to make contributions in amounts necessary to meet the actuarial needs of ERS that are not contingent on changes in an employer's workforce.  *Third*, the Bondholders argued that ERS receives employer contributions on account of employee loans that are subject to the Bondholders' liens.

29.     ERS also filed supplemental briefs on March 21, 2018 (No. 17-213, Dkt. Nos. 198, 205).  *First*, ERS argued that a hypothetical judgment creditor could possess a judicial lien under § 544 because Act 66 is not applicable to ERS.  *Second*, ERS argued that, "even without the application Bankruptcy Code section 544, under the UCC, the [Oversight Board] as a 'lien creditor' has priority over the Bondholders' unperfected security interest, rendering the Bondholders, at best, unsecured claimants and voiding their security interest pursuant to Bankruptcy Code section 506(d)."  *Third*, ERS argued that changes in the number of employees or how much employees earned could change the amount of employer contributions remitted to

10

ERS from one month to the next.  ERS also noted that employer contributions varied and were not fixed.  *Fourth*, ERS stated that it does not know whether any employer contributions deposited in the ERS general operational account were ever used to fund employee loans and argued that the ERS Bondholders were not entitled to additional discovery regarding employee loans.

30.    The Official Committee of Retired Employees of the Commonwealth ("Retiree Committee") filed briefs (No. 17-213, Dkt. Nos. 196, 204) raising arguments similar to ERS.

31.    On April 9, 2018, the ERS Bondholders filed a short informative motion to bring the court's attention to statements made by Governor Rosselló after the close of supplemental briefing.  *FOMB ex rel. ERS v. Altair Global Credit Opportunities Fund (A), LLC, et al.,* Adv. Proc. No. 17-213, Dkt. No. 211 (D.P.R. Apr. 9, 2018).  ERS responded to that motion on April 11, 2018.  *FOMB ex rel. ERS v. Altair Global Credit Opportunities Fund (A), LLC, et al.,* Adv. Proc. No. 17-213, Dkt. No. 213 (D.P.R. Apr. 11, 2018).

32.    The court has taken no action since the close of supplemental briefing.

F.    Altair Global Credit Opportunities Fund (A), LLC, et al. v. Commonwealth of Puerto Rico et al., Adv. Proc. Nos. 17-219 and 17-220 (D.P.R. July 27, 2017)

33.    On July 27, 2017, the ERS Bondholders initiated an adversary proceeding against ERS, the Commonwealth and Commonwealth officials, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"),[5] and the Oversight Board.  *Altair Global Credit Opportunities Fund (A), LLC, et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-219, Dkt. No. 1 (D.P.R. July 27, 2017).  The operative amended complaint (No. 17-219, Dkt. No.

---

[5] AAFAF is an entity created pursuant to the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, P.R. Act No. 2-2017, for the purpose of acting as fiscal agent, financial advisor, and reporting agent of the Commonwealth, its agencies, instrumentalities, subdivisions, public corporations, and municipalities.

39), filed November 8, 2017, seeks declaratory relief related to Joint Resolution 188 and Act 106-2017 (the "Post-Petition Legislation").  It does not seek monetary damages (aside from attorneys' fees and litigation costs) from any defendant.  The amended complaint includes eight counts.  It alleges that the Post-Petition Legislation violated the automatic stay in ERS's Title III case (Count I), and is thus void *ab initio* such that ERS continues to exist, receiving employer contributions on which the ERS Bondholders retain liens (Count II).   In the event the Post-Petition Legislation is not void, the complaint alleges that under the Uniform Commercial Code, the liens follow the collateral into the Commonwealth's coffers (Count III).   Alternatively, if the Post-Petition Legislation is found to eliminate the ERS Bondholders' liens, the complaint alleges that the legislation unjustly enriched the Commonwealth (Count IV), took the ERS Bondholders' "private property" not "for public use" and "without just compensation" in violation of the Fifth Amendment (Counts V-VII), and violated the Contracts Clauses of the United States and Puerto Rico Constitutions (Count VIII).

34.     The prayer for relief seeks an order (a) enforcing the automatic stay and declaring that the Post-Petition Legislation were void ab initio, (b) determining that Plaintiffs hold a secured claim to the full extent of their allowed claims against ERS and the Commonwealth, (c) declaring that Plaintiffs' lien continues in any Pledged Property transferred to the Commonwealth from ERS and any transfer without Plaintiffs' consent will result in an unjust enrichment of the Commonwealth at Plaintiffs' expense, (d) declaring that the transfer from ERS to the Commonwealth pursuant to the Post-Petition Legislation was not for a "public use" under the Takings Clause and constitutes an unconstitutional taking of private property without just compensation under the Takings Clause, (e) declaring that any award of just compensation cannot

be impaired by a PROMESA plan of adjustment, and (f) declaring that the Post-Petition Legislation violates the Contracts Clause.

35.     The Oversight Board, joined by AAFAF on behalf of the Commonwealth, the Commonwealth's Governor and Treasury Secretary ("Government Defendants"), and a limited intervenor, the Retiree Committee, moved to dismiss the Bondholders' complaint in its entirety. *Altair Global Credit Opportunities Fund (A), LLC, et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-219, Dkt. Nos. 41, 43, 44 (D.P.R.). *First*, the Oversight Board challenged the Bondholders' lien-based claims (Counts II and III), including their takings claims (Counts V-VII), on the ground that the Bondholders failed to allege perfected security interests in ERS's employer contributions. *Second*, the Board, along with the Retiree Committee, argued that § 305 of PROMESA bars the ERS Bondholders' claim for violation of the automatic stay because it prohibits the Title III court from interfering with a debtor's property or revenues and, in any event, that the Post-Petition Legislation fits into an exception to the automatic stay for actions to enforce a governmental unit's regulatory power. *Third*, the Board opposed the Bondholders' takings claims on the grounds that the Post-Petition Legislation is for a "public use," and that the takings claims were essentially interference with contract claims. The Board also alleged that the Bondholders failed to establish a valid property interest because they have not demonstrated that they have a legally cognizable, unavoidable lien. The Board also alleged that, with respect to the takings claim, the Bondholders seek an advisory opinion because the Bondholders do not yet know what the Oversight Board's plan of adjustment might ultimately propose, and whether they will be compensated under that plan. The Board also alleged that the Bondholders lacked standing because only ERS has standing to pursue claims that ERS was harmed. The Retiree Committee argued that the ERS Bondholders must first pursue their takings claim in the Court of Federal

Claims or pursue an inverse condemnation remedy in Puerto Rico's Commonwealth courts. *Fourth*, the Oversight Board and Retiree Committee also argued that the Bondholders fail to state a Contracts Clause claim because the Post-Petition Legislation did not substantially impair their contractual relationship with ERS, and that the Bondholders' unjust enrichment claim fails for various reasons. *Fifth*, the Government Defendants argued that the entire complaint must be dismissed because ERS's issuance of the underlying bonds was ultra vires.

36.    The ERS Bondholders opposed dismissal on all counts. *Altair Global Credit Opportunities Fund (A), LLC, et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-219, Dkt. No. 50 (D.P.R. Dec. 20, 2017). *First*, the Bondholders argued that Counts II and III of the amended complaint adequately allege perfected security interests, and that the parties had agreed to litigate the validity and enforceability of the Bondholders' liens in a separate adversary proceeding that was still pending (*see supra* Part I.E). *Second*, the Bondholders argued that the automatic stay (Count I) covers the Post-Petition Legislation, which does not fall into the claimed exception for administrative or judicial actions. The Bondholders also argued that § 305 does not bar the automatic stay claim, because (among other things) undoing the Commonwealth and Oversight Board's interference with ERS's property and revenues does not itself "interfere with" ERS's property or revenues. *Third*, the Bondholders argued that they have viable takings claims. They argued that they hold valid, perfected liens that were taken by the Post-Petition Legislation not for a public use. The Bondholders also argued that it was proper for them to pursue declaratory relief for the alleged taking in federal district court, rather than pursuing just compensation in Puerto Rico commonwealth court, because under the standard in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 521-22 (1998) (plurality op.), it was clear that Puerto Rico did not intend to pay just compensation when it enacted the Post-Petition Legislation. *Fourth*, the Bondholders argued that

they had viable unjust enrichment claims and Contracts Clause claims. *Fifth*, the Bondholders argued that, as a matter of Puerto Rico law, ERS's bond issuance was authorized and not ultra vires.

37.     The Oversight Board, Government Defendants, and Retiree Committee all filed reply briefs further contesting the viability of the ERS Bondholders' claims. *Altair Global Credit Opportunities Fund (A), LLC, et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-219, Dkt. Nos. 59, 61, 62 (D.P.R.)

38.     On February 2, 2018, the court issued an order stating that it had "not scheduled oral argument in connection with the Motions to Dismiss as it is taking the manner on submission," and noted that it would schedule argument if it later "determine[d] that it is necessary." *Altair Global Credit Opportunities Fund (A), LLC, et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-219, Dkt. No. 65.

39.     The court has not yet taken further action.

G.  ERS Bondholders' Adequate Protection Motion in ERS Title III Case and Commonwealth Title III Case,
    In re FOMB ex rel. ERS, No 17-3566
    In re FOMB ex rel. Commonwealth of Puerto Rico, No 17-3283

40.     On July 3, 2018, the ERS Bondholders filed a motion in both ERS's and the Commonwealth's Title III cases seeking to lift the automatic stay in the complete absence of adequate protection. *In re FOMB ex rel. ERS*, No 17-3566, Dkt. No. 289 (D.P.R. July 3, 2018); *In re FOMB ex rel. Commonwealth of Puerto Rico*, No 17-3283, Dkt. No. 3418 (D.P.R. July 3, 2018). The Bondholders had been receiving certain protections pursuant to a court order, but they noted that there would soon be no funds to make monthly transfers to the ERS Fiscal Agent. They argued that ERS and the Commonwealth had not responded to their request to provide adequate protection and the court should lift the automatic stay in those circumstances.

41.     The Oversight Board's opposition to the motion is due on July 10, 2018, and the Court is expected to hear argument on July 25, 2018.

## II.     PROCEEDINGS INVOLVING OTHER PARTIES

A. The Puerto Rico Funds' Motion in ERS Title III Case,
   In re FOMB ex rel. ERS, No 17-3566

42.     On November 28, 2017, certain ERS Bondholders (not including the Plaintiffs here) filed a motion in the ERS Title III case. *In re FOMB ex rel. ERS*, No 17-3566, Dkt. No. 221 (D.P.R. Nov. 28, 2017).  The motion argued that the court should condition the automatic stay on the continuation of the interim ERS Bondholder protections set forth in the order entered on July 17, 2017. *See supra* ¶ 20-21.  In the alternative, the motion argued that the court should enforce its July 17, 2017 order and enjoin the Commonwealth from ending adequate protection payments, arguing that such payments were required by the stipulation until the court resolved the parties' summary judgment motions in the declaratory judgment action (*see supra* I.E).

43.     The court heard argument regarding the motion on December 20, 2017.  On December 28, 2017, the court granted the motion in part.  It interpreted the stipulation and required ERS to transfer funds to the Fiscal Agent for purposes of distributing interest payments to all ERS Bondholders, and to continue doing so until the earlier of (1) the court's resolution of the declaratory judgment action or (2) the exhaustion of ERS funds. *In re FOMB ex rel. ERS*, No 17-3566, Dkt. No. 248 (D.P.R. Dec. 28, 2017).

B. Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.,
   Adv. Proc. No. 17-159 (D.P.R. June 8, 2018)

44.     On June 8, 2017, Ambac Assurance Corp., a bond insurer for bonds issued by the Puerto Rico Highways and Transportation Authority ("HTA"), filed an adversary complaint against the Commonwealth and certain Commonwealth officials, AAFAF, the Oversight Board

and its members, and HTA.   On July 7, 2017, Ambac filed an amended adversary complaint (a) seeking declaratory and injunctive relief holding that the fiscal plan and certain legislation violated the Contracts Clause of the U.S. Constitution, effected a taking in violation of the Fifth Amendment, and violated the Due Process Clause, (b) alleging that the fiscal plan and certain legislation violated PROMESA and the Bankruptcy Code, (c) alleging that certain orders denied access to the courts, and (c) seeking dismissal of HTA's Title III petition.   *Ambac v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-bk-159, Dkt. No. 35.

45.     On July 28, 2017, the defendants filed a motion to dismiss arguing that (a) Ambac lacked standing to pursue its claims; (b) PROMESA deprived the court of jurisdiction to entertain challenges to the Board's decision to certify fiscal plans; (c) certain claims were not ripe, and (d) Ambac failed to state claims under the Contracts Clause, the Takings Clause, the Due Process Clause, PROMESA and the Bankruptcy Code.   *Ambac v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-bk-159, Dkt. No. 48.

46.     On September 12, 2017, Ambac filed an opposition brief in which it challenged each of the points raised by the defendants, arguing that (a) the Court possessed jurisdiction to entertain all the claims, and (b) Ambac had stated viable claims under the Contracts Clause, the Takings Clause, the Due Process Clause, PROMESA, and the Bankruptcy Code.   *Ambac v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-bk-159, Dkt. No. 74.

47.     On October 31, 2017, the defendants filed a reply brief, in which they reemphasized the arguments made in their motion to dismiss.   *Ambac v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-bk-159, Dkt. No. 100.

48.     On November 21, 2017, Judge Swain heard argument on the motion to dismiss.

49.     On February 27, 2018, Judge Swain dismissed the Ambac case.  The court held that Ambac had standing, but that it lacked subject matter jurisdiction to entertain challenges to the certification of the fiscal plan.  The court dismissed the Takings Clause and Due Process Clause claims on the ground that they were not ripe in the absence of a final plan of adjustment.  And it dismissed claims under the Contracts Clause, PROMESA, and the Bankruptcy Code on the merits. *Ambac v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-bk-159, Dkt. No. 156.

50.     On March 9, 2018, Ambac appealed the dismissal to the First Circuit (1st  Cir. No. 18-1214).  Briefing is ongoing.

C.  ACP Master LTD., et al. v. Commonwealth of Puerto Rico et al.,
    Adv. Proc. No. 17-189 (D.P.R. June 28, 2017)

51.     On June 28, 2017, the ad hoc group of General Obligation bondholders (the "GO Bondholders) filed an adversary complaint against the Commonwealth and the Oversight Board seeking declarations that certain tax revenues are restricted funds that cannot be used by the Commonwealth for any purpose other than to satisfy "constitutional debt"; the Commonwealth lacks an equitable or beneficial interest in the property; the GO Bondholders have a statutory lien on the property; the property are special revenues under the Bankruptcy Code; and the Commonwealth's diversion of revenues without just compensation is an unlawful taking.  The complaint also seeks declaratory and injunctive relief enjoining the defendants from allegedly continuing to divert restricted revenues, and directing the defendants to segregate and preserve the restricted revenues for payment of "constitutional debt."    *ACP Master LTD., et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-bk-189, Dkt. No. 1.

52.     On August 21, 2017, the defendants filed a motion to dismiss.  The Defendants argued that (a) § 305 of PROMESA deprived the Court of jurisdiction to interfere with the Commonwealth's property without the Oversight Board's consent or unless in accordance with a

plan of adjustment, (b) the GO Bondholders failed to state a claim for a Fifth Amendment taking because the GO bonds are unsecured and GO Bondholders have no property rights for Fifth and Fourteenth Amendment purposes, (c) the tax revenues are not restricted funds under Puerto Rico law, (d) the GO Bondholders do not have a statutory lien or a lien on special revenues, (e) the GO Bondholders have no right to segregation of any assets of the Commonwealth, and (f) certain claims were preempted. *ACP Master LTD., et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-bk-189, Dkt. No. 35.

53.     On October 17, 2017, the GO Bondholders filed an opposition to the defendants' motion to dismiss.  The GO Bondholders argued that (a) their claims were justiciable and § 305 did not bar the court's review, (b) the complaint stated a valid Takings Clause claim, (c) the revenues are restricted under Puerto Rico law, (d) they have statutory liens on the tax revenues, (e) they stated claims for relief concerning the segregation and preservation of restricted revenues, and (f) the claims were not preempted. *ACP Master LTD., et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-bk-189, Dkt. No. 67.

54.     On November 13, 2017, the defendants filed a reply brief, in which they reemphasized the arguments made in their motion to dismiss.  *ACP Master LTD., et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-bk-189, Dkt. No. 78.

55.     On January 30, 2018, Judge Swain dismissed the complaint in its entirety, holding that certain counts sought advisory opinions and therefore were outside the court's jurisdiction. The court dismissed the takings claim as not ripe for adjudication in the absence of a final plan of adjustment that will determine the amount creditors will receive for their asserted property rights. The court also held that several counts failed to state a claim upon which relief could be granted because § 305 of PROMESA restricted the court's ability to enter certain types of relief related to

the Commonwealth's exercise of its governmental powers or its use of its revenue.  *ACP Master*

*LTD., et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 17-bk-189, Dkt. No. 124.

56.     On March 9, 2018, the GO Bondholders appealed the dismissal to the First Circuit

(1st  Cir. No. 18-1108).  Briefing is ongoing.  On May 25, 2018, Plaintiffs filed an amicus brief in

support of certain of the arguments asserted by the GO Bondholders.

  D.  The Appointments Clause Litigation: <u>UTIER v. Puerto Rico Electric Power
      Authority, et al.</u> (Adv. Proc. No. 17-228) and <u>Aurelius' Motion to Dismiss
      Commonwealth Title III Petition</u> (Dkt. No. 913 in Case No. 17-3283)

57.     On August 6, 2017, the Union de Trabajadores de la Industria Electrica y Riego

("<u>UTIER</u>"), the principal labor union representing employees of the Puerto Rico Electric Power

Authority ("<u>PREPA</u>"), commenced an adversary proceeding against the Oversight Board, its board

members, and PREPA.  *UTIER v. PREPA*, Adv. Proc. No. 17-bk-228, Dkt. No. 1 (the "<u>UTIER</u>

<u>Adversary Proceeding</u>").  UTIER subsequently amended its complaint on November 10, 2017.

*UTIER v. PREPA*, Adv. Proc. No. 17-bk-228, Dkt. No. 75.  The amended complaint alleged that

the Oversight Board's members were appointed in a manner that violates the Appointments Clause

of the U.S. Constitution, *see* U.S. Const., art. II, § 2, cl. 2, because the Oversight Board's members

"exercise[d] significant authority pursuant to the laws of the United States," and are thus "Officers

of the United States" within the meaning of the Appointments Clause.  *Id.* ¶89.

58.     On August 7, 2017, Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC,

and Lex Claims, LLC, who claim to be holders of Puerto Rico bonds, (collectively, "<u>Aurelius</u>")

filed a motion to dismiss the Commonwealth's Title III petition (the "<u>Aurelius Motion</u>").   *In re*

*FOMB ex rel. Commonwealth of Puerto Rico*, No. 17-bk-3283, Dkt. No. 913 (D.P.R.).   The

Aurelius motion, like the UTIER Adversary Proceeding, argued that PROMESA's scheme for

appointment of the Oversight Board's members violates the Appointments Clause because the

members are "Officers of the United States" within the meaning of the Appointments Clause, and that the scheme violates principles of separation-of-powers because PROMESA requires the President to select the board members from a slate of candidates proposed by members of Congress.

59.     The Aurelius Motion proceeded more quickly than the UTIER Adversary Proceeding:  On November 3, 2017, several parties, including the Oversight Board and AAFAF on behalf of the Commonwealth, filed objections to the Aurelius Motion.  *See In re FOMB ex rel. Commonwealth of Puerto Rico*, No. 17-bk-3283, Dkt. Nos. 1610 (AFSCME), 1622 (Oversight Board), 1629 (Retiree Committee), 1631 (UCC), 1638 (COFINA Senior Bondholders), and 1640 (AAFAF).  The objections primarily argued that the Appointments Clause does not apply to the Oversight Board because Congress enacted PROMESA pursuant to the Territories Clause of Article IV of the U.S. Constitution, *see* U.S. Const., art. IV, § 3, cl. 2, and because the Oversight Board is part of the territorial government in accordance with PROMESA § 101(c).  As such, the objections argued that the Oversight Board's members are not federal officers, subject to the Appointments Clause, but instead territorial officers.  An ad hoc group of GO Bondholders submitted a statement in support of Aurelius's motion.  *See In re FOMB ex rel. Commonwealth of Puerto Rico*, No. 17-bk-3283, Dkt. No. 1627.

60.     On November 17, 2017, Aurelius filed a reply in support of its motion to dismiss.  *In re FOMB ex rel. Commonwealth of Puerto Rico*, No. 17-bk-3283, Dkt. No. 1833.  Aurelius argued that the Appointments Clause does apply when Congress acts pursuant to the Territories Clause because "the Appointments Clause has always been understood to apply to territorial officers" when they are appointed by the Federal Government, *id.* at 14.  Aurelius also reiterated its argument that the Board members are "officers of the United States" within the meaning of the

Appointments Clause. *Id.* at 19. Aurelius also argued that if PROMESA violates the Appointments Clause, the proper remedy is to sever the offending provisions and allow the President to appoint new Board members, subject to Senate approval.

61. Meanwhile, the UTIER Adversary Proceeding continued: On November 20, 2017, the Oversight Board and AAFAF on behalf of the Commonwealth filed motions to dismiss UTIER's adversary complaint. *See UTIER v. PREPA*, Adv. Proc. No. 17-bk-228, Dkt. Nos. 88 (Oversight Board) and 96 (AAFAF). Intervenors AFSCME and the UCC also each filed full or partial joinders to the Oversight Board's motion to dismiss. *UTIER v. PREPA*, Adv. Proc. No. 17-bk-228, Dkt. Nos. 89 (UCC); 95 (AFSCME). Then, on December 1, 2017, UTIER filed its omnibus opposition to the motions to dismiss the UTIER Adversary Proceeding. *UTIER v. PREPA*, Adv. Proc. No. 17-bk-228, Dkt. No. 100 (UTIER). Finally, on December 22 and 23, the Oversight Board, AAFAF on behalf of the Commonwealth, AFSCME, and the UCC, filed replies in support of their motions to dismiss the UTIER Adversary Proceeding. *UTIER v. PREPA*, Adv. Proc. No. 17-bk-228, Dkt. No. 103 (UCC), 104 (Oversight Board); 106 (AFSCME); 108 (AAFAF). The arguments in these filings were substantially similar to the arguments raised in the briefs regarding the Aurelius Motion.

62. The United States weighed in on both cases on December 6, 2017, filing a memorandum of law in support of the constitutionality of PROMESA in both the Aurelius Motion and the UTIER Adversary Proceeding. *In re FOMB ex rel. Commonwealth of Puerto Rico*, No. 17-bk-3283, Dkt. No. 1929; *UTIER v. PREPA*, Adv. Proc. No. 17-bk-228, Dkt. No. 101. The United States argued that the Appointments Clause does not apply to the appointment of territorial officers, that the Oversight Board's members are territorial officers rather than federal officers, and that PROMESA's scheme does not violate the U.S. Constitution's separation-of-powers

requirements.  Specifically, as to the Appointments Clause challenge, the United States argued that "Supreme Court precedent and more than two centuries of evolving territorial governance demonstrate that Congress's plenary authority to create a territorial entity under the Territory Clause . . .  is not constrained by the Appointments Clause" (U.S. brief at 8), and that "history shows that Congress has adopted various territorial governance structures"—including those for Puerto Rico—"pursuant to its Article IV authority without regard to the Appointments Clause" (*id.* at 12).

63.     On December 22 and 23, 2017, the Oversight Board, Aurelius and UTIER filed replies to the United States' memorandum.  *In re FOMB ex rel. Commonwealth of Puerto Rico*, No. 17-bk-3283, Dkt. No. 2159 (Oversight Board), 2169 (Aurelius); *UTIER v. PREPA*, Adv. Proc. No. 17-bk-228, Dkt. No. 107 (UTIER).  The Oversight Board agreed with the United States that the Appointments Clause does not apply to territorial officers because Congress is not bound by the U.S. Constitution's separation-of-powers constraints when it legislates for the territories. Aurelius and UTIER reiterated their arguments that the Appointments Clause applies whether or not Congress legislates with respect to a territory or the Oversight Board members are territorial officers because "the historical evidence is overwhelming that, ever since the founding, principal territorial officials have been appointed by the President and confirmed by the Senate as required by the Appointments Clause."  *In re FOMB ex rel. Commonwealth of Puerto Rico*, No. 17-bk-3283, Dkt. No. 2169, at 8 (Aurelius Brief).  Aurelius and UTIER also reiterated their arguments that the Board members are "officers of the United States" within the meaning of the Appointments Clause.  *Id.* at 10.

64.     On January 2, 2018, Aurelius filed a sur-reply in response to the Oversight Board's reply to the United States' memorandum, which largely reiterated its arguments.  *In re FOMB ex rel. Commonwealth of Puerto Rico*, No. 17-bk-3283, Dkt. No. 2198.

65.     On January 10, 2018, Judge Swain held a joint hearing on the Aurelius Motion and the motions to dismiss the UTIER Adversary Proceeding.  At the conclusion of the hearing, Judge Swain took both matters under advisement.  The cases are still pending.

E.    FOMB v. Hon. Ricardo Antonio Rosselló, Adv. Proc. No. 17-250 (D.P.R.)

66.     On August 28, 2017, the Oversight Board commenced an adversary proceeding against the Governor of Puerto Rico seeking declaratory and injunctive relief pursuant to PROMESA.  *FOMB v. Hon. Ricardo Antonio Rosselló*, Adv. Proc. No. 17-250, Dkt. No. 1 (D.P.R. Aug. 28, 2017).  As alleged in the complaint, the Oversight Board, pursuant to its powers set forth in PROMESA, certified a fiscal plan for the Commonwealth on March 13, 2017, which included labor-reform amendments to the fiscal plan, including furloughs, and pension-reform amendments. The Oversight Board alleged that it had "required these two amendments to achieve sufficient liquidity and budgetary savings that the [Oversight Board] determined were necessary to make the fiscal plan compliant with PROMESA."  *Id.* at 3.  The Board also alleged that the Governor refused to implement the amendments in the fiscal plan and failed to notify and provide explanation to the Oversight Board, the President, and other federal officials of that decision as required by PROMESA.  Thereafter, according to the complaint, the Governor informed the President and Congressional leaders that he would not implement the plan amendments because they were not mandatory parts of the fiscal plan, but were merely recommendations.

67.     In the complaint, the Board alleged that "[o]nce certified by the [Oversight Board] in its sole discretion, the Governor must comply with the fiscal plan."  *Id.* at 4.  Accordingly, the

Oversight Board sought a declaration that (i) the plan amendments were "mandatory parts of the Commonwealth Fiscal Plan certified by the [Oversight Board] pursuant to PROMESA § 201" and (ii) the "Governor must enforce and comply with all aspects of the Commonwealth Fiscal Plan," including the labor-reform and pension-reform amendments. *Id.* at 4-5. The Oversight Board also sought an injunction prohibiting the Governor from refusing to comply the fiscal plan.

68.     The Oversight Board relied on a number of PROMESA provisions in its complaint. For example, the complaint alleged that under § 201 of PROMESA, the Oversight Board has the sole authority to certify a proposed fiscal plan when the Board determines, in its sole discretion, that such plan complies with the requirements of § 201(b) of PROMESA. *Id.* at ¶ 59. The complaint also alleged that § 104(k) of PROMESA permits the Oversight Board to "seek judicial enforcement of its authority to carry out its responsibilities" under PROMESA, including its responsibility, exclusive authority, and sole discretion to certify a fiscal plan. *Id.* at ¶ 68. And the complaint alleged that § 108 of PROMESA provides that neither the Governor nor the Legislature of the Commonwealth "may enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board." *Id.* at ¶ 67

69.     Shortly after Hurricane Maria hit Puerto Rico, the Oversight Board published a press release in which the Board stated that, due to the devastation caused by the hurricane, it was "postponing any discussion of furloughs until next fiscal year and it [was] withdrawing its related lawsuit." Press Release, Oversight Board Urges Maximum Support for Puerto Rico with Trump Administration Officials Congress (Sept. 30, 2017), *available at* https://oversightboard.pr .gov/documents/. On October 4, 2017, the Oversight Board filed a notice of voluntary dismissal and the court entered an order dismissing the adversary proceeding.

F.  Oversight Board's Motion for Appointment of Chief Transformation
Officer in PREPA Title III Case, In re FOMB ex rel;. PREPA, No. 17-4780

70.    On July 2, 2017, the Oversight Board filed a Title III petition for PREPA, an instrumentality of the Commonwealth that generates and distributes substantially all of the electric power in Puerto Rico.  On October 26, 2017, one month after Hurricane Maria, the Board filed a motion requesting appointment of a chief transformation officer ("CTO") to coordinate and oversee PREPA's disaster response and recovery process.  *In re FOMB ex. PREPA*, No. 17-4780, Dkt. No. 361 (D.P.R. Oct. 26, 2017).  Pursuant to the relief sought in the motion, the CTO would report directly to the Oversight Board.  The Oversight Board argued that appointment of the CTO was appropriate because PROMESA empowered it to take any action necessary on behalf of PREPA to effectuate a successful restructuring.

71.    A number of parties objected, including AAFAF on behalf of the Commonwealth, the Ad Hoc Group of PREPA Bondholders, and an agent for fuel-line lenders to PREPA.  *In re FOMB ex re. PREPA*, No. 17-4780, Dkt. Nos. 377, 380, 381 (D.P.R.).  The parties argued that PROMESA does not grant the Oversight Board absolute authority over the Commonwealth and its instrumentalities (like PREPA) and does not authorize the Board to manage PREPA's operations and financial decisions.

72.    On November 8, 2017, the Board filed a reply in support of its motion.  *In re FOMB ex re. PREPA*, No. 17-4780, Dkt. No. 414 (D.P.R.).  AAFAF filed a surreply in response to the Board's reply on November 12, 2017.  *In re FOMB ex re. PREPA*, No. 17-4780, Dkt. No. 447 (D.P.R.).

73.    The court heard argument on the motion on November 13, 2017.

74.    On November 16, 2017, the court issued an opinion and order denying the Oversight Board's motion to appoint the CTO.  *In re FOMB ex re. PREPA*, No. 17-4780, Dkt. No.

471 (D.P.R. Nov. 16, 2017).  The court held that no provision in PROMESA, as well as no provision of Commonwealth law, expressly authorized the Oversight Board to appoint a CTO. The court cited multiple provisions in PROMESA where responsibilities relating to Puerto Rico's restructuring—for example the development of fiscal plans or certified budgets—rests with the Commonwealth in the first instance.  The Oversight Board's powers only arise if the Commonwealth's proposals or actions fail to comply with PROMESA's objectives.  The court noted that the Oversight Board had not asserted that PREPA was non-compliant with a certified fiscal plan or budget.  The Court further observed that "the degree of unilateral power that Congress has granted to the FOMB stands in contrast to the powers Congress granted to the District of Columbia Financial Control Board. . . ."  *Id*. at 13.  The Court explained, "the D.C. Board was empowered, for example, to essentially declare significantly inconsistent legislative acts null and void unilaterally, and to pre-review every contract the D.C. government proposed to execute."  *Id*. However, Judge Swain noted, "in drafting PROMESA section 204, Congress declined to include such provisions."  *Id*.

G. Pinto Lugo v. United States, Adv. Proc. No. 18-041 (D.P.R. April 24, 2018)

75.    On April 28, 2018, a nonprofit organization, a group of labor unions, and one individual bondholder sued the United States, the Oversight Board, and Governor Ricardo Rosselló Nevares, seeking a declaratory judgment that PROMESA violates the Declaration of Independence, the First Amendment, the Fifth Amendment, the Fourteenth Amendment, the U.N. Charter, the U.N. Declaration of Human Rights, and the International Covenant on Civil and Political Rights.  *Pinto Lugo v. United States*, No. 18-041, Dkt. No. 1 (D.P.R. April 24, 2018).

76.    In the alternative, the complaint sought the removal of two members of the Oversight Board on the basis that they have conflicts of interest stemming from their professional

relationship to a company involved in the issuance of certain Puerto Rico bonds.  The complaint further requested that the court stay any fiscal plans adopted pursuant to PROMESA while a forensic audit is performed on the Commonwealth's finances, bar the government of Puerto Rico from disposing of the Puerto Rico Electrical Power Authority without complying with certain provisions in the Constitution of Puerto Rico, and require the United States to assume "any and all liabilities it should be compelled to assume over the public debt of the government of Puerto Rico and the illegal and unconstitutional imposition of the FOMB over the Plaintiffs, Puerto Rico, and its residents." *Id.* at 6-7.

77.    Defendants have not yet filed a responsive pleading

H.  Assured Guaranty Corp. v. Commonwealth of Puerto Rico,
      Adv. Proc. No. 18-059 (D.P.R. May 23, 2018)

78.    On May 23, 2018, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Federal Guaranty Insurance Company initiated an adversary proceeding seeking declaratory relief against the Commonwealth, the Oversight Board, and AAFAF.  *Assured Guaranty Corp. v. Commonwealth of Puerto Rico*, Adv. Proc. No. 18-059, Dkt. No. 1 (D.P.R. May 23, 2018).

79.    The complaint alleges that the revised Commonwealth fiscal plan, developed and certified by the Oversight Board, violates PROMESA and the United States Constitution. Specifically, the complaint alleges that the fiscal plan (i) fails "to respect the relative lawful priorities and lawful liens" pursuant to Commonwealth law as required by § 201(b)(1)(N) of PROMESA; (ii) fails to prevent the transfer of one agency's assets to another agency as required by § 201(b)(1)(M) of PROMESA; (iii) fails "to identify expenses for essential public services" as required by § 201(b)(1)(B) of PROMESA; and (iv) violates § 303 of PROMESA (prohibiting moratorium laws that impose a non-consensual moratorium on payments of principal and interest on creditors), § 407 of PROMESA (creating liability for the transfer of any property of an

instrumentality of the Commonwealth in violation of applicable law under which a creditor possesses a valid pledge, lien, or security interest in such property), and § 928 of the Bankruptcy Code (requiring postpetition special revenues remain subject to any lien created before the commencement of the municipal bankruptcy proceeding). The complaint also alleges that the revised fiscal plan violates the Contracts Clause, the Takings Clause, and Due Process Clause of the United States Constitution. Ultimately, the complaint seeks a declaration that the revised fiscal plan is unlawful and unconstitutional and cannot be used as a basis for any plan of adjustment.

80.     On June 25, 2018, the defendants filed a motion to stay all litigation related to the adversary complaint, pending resolution of another case in the First Circuit. *Assured Guaranty Corp. v. Commonwealth of Puerto Rico*, Adv. Proc. No. 18-059, Dkt. No. 14 (D.P.R. June 25, 2018). The defendants argued that the claims in the adversary complaint are substantially similar to claims asserted in a separate adversary proceeding commenced by separate parties—*Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00159 (D.P.R.). The court had previously granted a motion to dismiss that proceeding and an appeal is in progress.

81.     The court has not ruled on the motion to stay. Objections are due on July 9, 2018, and replies are due on July 16, 2018.

I.     Hermandad de Empleados del Fondo del Seguro del Estado v. United States, Adv. Proc. No. 18-066 (D.P.R. May 30, 2018)

82.     On May 30, 2018, a group of Puerto Rican labor unions sued the United States, the Oversight Board, the Commonwealth, and Governor Ricardo Rosselló Nevares for violations of union members' right to vote under the Declaration of Independence, the Preamble of the Constitution, the 13th and 15th Amendments, and various international human rights instruments. *Hermandad de Empleados del Fondo del Seguro del Estado v. United States*, Adv. Proc. No. 18-066, Dkt. No. 1 (D.P.R. May 30, 2018).

83.     The complaint makes allegations about the history of the United States' presence in Puerto Rico, beginning with what plaintiffs call an "illegal[] inva[sion]" in 1898 (¶ 1), continuing with the imposition of a "colonial system" exacerbated by the "ignominious" *Insular Cases* (¶¶ 2-4), and culminating in the passage of PROMESA, which plaintiffs allege allowed the Oversight Board to "certif[y] and impose[] a Fiscal Plan as the 'blueprint' that the Commonwealth[] . . . shall follow in the next five fiscal years," and to "certif[y] and impose[] the Commonwealth's FY18 budget against the political will of the Legislature of Puerto Rico" (¶ 9). *Id.*  The complaint requests a declaration that all of the Oversight Board's acts are "unconstitutional and null," and requests an order enjoining the defendants from continuing the Title III cases or taking other actions pursuant to "power or authority provided by PROMESA."  *Id.* at 55.

84.     Defendants have not yet filed a responsive pleading.

J.  Hon. Ricardo Antonio Rosselló *et al*. v. FOMB,
    Adv. Proc. No. 18-080 (D.P.R.)

85.     On July 5, 2018, the Governor of Puerto Rico and AAFAF filed an adversary complaint against the Oversight Board.  *Hon. Ricardo Antonio Rosselló et al. v. FOMB*, Adv. Proc. No. 18-080, No. 17-03283, Dkt. No. 3435 (D.P.R.).   The complaint seeks (a) a declaratory judgment that the Oversight Board cannot mandate implementation of rejected policy recommendations through enforcement of the board fiscal plan, (b) a declaratory judgment that the Oversight Board cannot mandate the implementation of rejected policy recommendations through the Board-certified budget, and (c) an injunction prohibiting the defendants from implementing and enforcing the Oversight Board's rejected policy recommendations in the board fiscal plan and board budget.

86.     According to the complaint, the plaintiffs "seek declaratory and injunctive relief to foil the Oversight Board's unlawful attempts to usurp the Commonwealth of Puerto Rico's

political and governmental powers and right to home rule."  Complaint at 2.  The complaint

contends that, "over the past several months, the Oversight Board has used the fiscal plan and

budget certification processes contemplated by [PROMESA], in an attempt to impose its policy

preferences on Puerto Rico's people, micromanage every aspect of budget expenditures, and

exercise legislative power the Board does not have, all over the objections of Puerto Rico's elected

Government."  *Id.* The complaint says the Oversight Board's efforts "exceed its lawful powers and

should be enjoined by this Court."  *Id.*

87.    The complaint acknowledges that "PROMESA granted the Oversight Board

authority to establish parameters to bring fiscal responsibility to Puerto Rico and monitor Puerto

Rico's progress, such as the power to approve and certify proposed fiscal plans and budgets for

both the Commonwealth and territorial instrumentalities."  *Id.* at 3.  The complaint also states that

the Oversight Board "has authority to monitor and review government actions for compliance with

certified fiscal plans and budgets."  *Id.*

88.    The Oversight Board has not yet filed a responsive pleading.

Respectfully submitted on July 6, 2018.

**Counsel for Plaintiffs**

By:    <u>*Christopher J. DiPompeo*</u>
Christopher J. DiPompeo
*Counsel of Record*
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
cdipompeo@jonesday.com

*Of Counsel:*

Bruce Bennett
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum
JONES DAY
250 Vesey Street
New York, NY 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Donald B. Ayer
Geoffrey S. Stewart
Beth Heifetz
Victoria Dorfman
Sparkle Sooknanan
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
dbayer@jonesday.com
gstewart@jonesday.com
bheifetz@jonesday.com
vdorfman@jonesday.com
ssooknanan@jonesday.com

Kamaile A.N. Turčan
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
kturcan@jonesday.com
*Admitted in Hawai'i
Not admitted in DC
(supervised by a licensed
DC Bar member)

**Counsel for the United States**

Respectfully submitted,

THOMAS G. WARD
Deputy Assistant Attorney General

MICHAEL RAAB
Acting Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

*/s Kenneth M. Dintzer*
KENNETH M. DINTZER
Deputy Director

*/s Christopher J. Carney*
CHRISTOPHER J. CARNEY
Senior Litigation Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC  20044
Telephone:  (202) 305-7597
Facsimile: (202) 307-0972
E-mail:  chris.carney@usdoj.gov