# In the United States Court of Federal Claims

No. 17-970C
Filed: November 23, 2020
FOR PUBLICATION

---

**ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC, ANDALUSIAN GLOBAL DESIGNATED ACTIVITY COMPANY, CROWN MANAGED ACCOUNTS FOR AND ON BEHALF OF CROWN/PW SP, GLENDON OPPORTUNITIES FUND, L.P., LMA SPC FOR AND ON BEHALF OF MAP 98 SEGREGATED PORTFOLIO, MASON CAPITAL MASTER FUND LP, NOKOTA CAPITAL MASTER FUND, L.P., OAKTREE-FORREST MULTI-STRATEGY, LLC (SERIES B), OAKTREE OPPORTUNITIES FUND IX, L.P., OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2), L.P., OAKTREE VALUE OPPORTUNITIES FUND, L.P., OCEANA MASTER FUND LTD, OCHER ROSE, L.L.C., PENTWATER MERGER ARBITRAGE MASTER FUND LTD., PWCM MASTER FUND LTD, AND SV CREDIT, L.P.,**

        *Plaintiffs*,

**v.**

**UNITED STATES,**

        *Defendant*.

Keywords: Jurisdiction; Failure to State a Claim; Rule 12(b)(1); Rule 12(b)(6); Fifth Amendment Takings Claim; PROMESA; 48 U.S.C. § 2121; 11 U.S.C. § 552; collateral estoppel; Puerto Rico

---

*Sparkle L. Sooknanan*, *Geoffrey S. Stewart*, *Beth Heifetz*, *Parker A. Rider-Longmaid*, *Ariel N. Volpe*, Jones Day, Washington, D.C., for the plaintiffs, with *Bruce Bennett* and *Benjamin Rosenblum*, of counsel.

*Christopher J. Carney*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant, with *L. Misha Preheim*, and *Alison S. Vicks*, U.S. Department of Justice, and *Jason E. Morrow*, U.S. Department of the Treasury, of counsel.

**MEMORANDUM OPINION**

*HERTLING*, **Judge**

The plaintiffs are current or former owners of secured bonds issued by the Employers Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"). The bonds, issued in 2008, were secured, in part, by anticipated future employer contributions to the ERS. In 2016, Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") to address the fiscal calamity confronting the Commonwealth of Puerto Rico. PROMESA created the Financial Oversight and Management Board for Puerto Rico ("the Board") and provided that the Board could seek to pursue under the Bankruptcy Code a judicially supervised financial-restructuring process for Puerto Rico and its instrumentalities. The plaintiffs seek just compensation for an alleged taking under the fifth amendment based on PROMESA's impact on their ERS bonds.

The plaintiffs initially alleged (1) that the Board drafted legislation and mandated that the Puerto Rico Legislature enact that legislation to transfer the plaintiffs' collateral to Puerto Rico without compensation. Following the Supreme Court's decision in *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020), the plaintiffs moved to file a second amended complaint, which seeks to add two additional claims: (2) that the ERS's Title III petition—filed pursuant to Title III of PROMESA and its incorporated provisions of the U.S. Bankruptcy Code—abolished, and thereby took, their security interest in future employer contributions that would become owed to the ERS after the petition date; and (3) that the ERS's Title III petition also took their contractual right to post-petition employer contributions.

The defendant, the United States, opposes the motion to file an amended complaint and, in the alternative, moves to dismiss all of the plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.

The Court grants the defendant's motion to dismiss.[1] Because the Board is not a federal entity, the Court dismisses the plaintiffs' first claim for lack of jurisdiction under RCFC 12(b)(1) and 12(h)(3). The plaintiffs do not have a property interest in post-petition employer contributions, and the impairment of the plaintiffs' contractual right is insufficient to constitute a taking. Accordingly, the Court dismisses the plaintiffs' second and third claims for failure to state a claim upon which relief can be granted under RCFC 12(b)(6).

---

[1] The Court granted the plaintiffs' motion for leave to file a second amended complaint (ECF 74) without prejudice to the defendant's then-forthcoming opposition to that motion. (ECF 75 & 78.) The Court adheres to that earlier decision and treats the plaintiffs' second amended complaint (ECF 76) as the operative complaint.

I.      **BACKGROUND**

A.      **Statutory Framework**[2]

1.      **ERS**

The ERS, created by the Puerto Rico Legislature in 1951, was originally funded by employer contributions, employee contributions, and investment earnings on its undistributed funds.  (ECF 76, ¶ 33.)  The ERS had a statutory right to receive employer contributions, which were the largest component of its income stream.  (*Id.*)

In 2008, the ERS adopted a resolution authorizing it to issue secured bonds.  (*Id.* ¶ 38.)  The bond resolution governs the contractual relationship between the ERS and the plaintiffs with respect to the ERS bonds.  (*Id.* ¶ 39.)  The bond resolution provided a security package to protect the investment made by holders of the ERS bonds.  (*Id.* ¶ 46.)  The security package was supported by collateral referred to as the "Pledged Property."  (*Id.* ¶ 47.)  The Pledged Property included, among other assets, employer contributions calculated and owed to the ERS.  (*Id.* ¶ 52.)

2.      **PROMESA**

In 2016, Congress passed PROMESA.  Pub. L. No. 114-187, 130 Stat. 549 (2016) (codified at 48 U.S.C. § 2101 *et seq.*).  PROMESA established the Board, which is authorized to file a petition in a designated federal court to restructure the debts of Puerto Rico or any of its instrumentalities in a court-supervised adjustment process.  (ECF 76, ¶ 57.)  To govern this restructuring process, Title III of PROMESA incorporated provisions of Chapters 9 and 11 of the U.S. Bankruptcy Code.  *See* 48 U.S.C. § 2161(a).

Congress declared that it created the Board pursuant to its authority under article IV, section 3 of the U.S. Constitution.  *Id.* § 2121(b)(2).  The codified purpose of establishing the Board was "to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  *Id.* § 2121(a).  Congress explicitly provided that the Board "shall be created as an entity within the territorial government" and "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government."  *Id.* § 2121(c)(1)-(2).  The Board consists of seven members appointed by the President.  *Id.* § 2121(e)(1)(A).

---

[2] Because the defendant moves to dismiss under RCFC 12(b)(1) and 12(b)(6), the facts as alleged in the second amended complaint (ECF 76) are assumed to be true.  This recitation of the facts does not therefore constitute findings of fact; rather, the Court provides a recitation of the facts as alleged by the plaintiffs.  For additional historical background, see this court's earlier opinion in this case.  *Altair Glob. Credit Opportunities Fund (A), LLC v. United States*, 138 Fed. Cl. 742, 746-49 (2018).

PROMESA requires the Governor of Puerto Rico to submit an annual fiscal plan to the Board for its approval. *Id.* § 2141. The Governor may not submit a budget to the Puerto Rico Legislature unless the Board has certified the fiscal plan for that fiscal year. *Id.* § 2141(c)(1). If the Governor does not submit a fiscal plan that meets PROMESA's requirements, the statute provides that the Board shall develop and submit its own fiscal plan to the Governor and Legislature. *Id.* § 2141(d)(2).

Exercising its statutory authority, the Board rejected the Governor's October 14, 2016, proposed fiscal plan that would not have affected the ERS or its financial obligations. (ECF 76, ¶ 79.) The Board identified changes it would require before it would certify the plan. (*Id.*) Among these changes demanded by the Board were reforms to address the ERS's unfunded pension liabilities. After a public hearing, the Board certified an amended fiscal plan. (*Id.* ¶ 80.)

The fiscal plan certified by the Board required the Puerto Rico Legislature to enact measures to compel the ERS to liquidate its assets and transfer all the proceeds to the Puerto Rico general fund without providing compensation to the bondholders. (*Id.* ¶ 81.) The legislation was also to divert payment of future employer contributions from the ERS to the Puerto Rico general fund. (*Id.*)

In 2017, the Puerto Rico Legislature passed Joint Resolution 188 pursuant to and consistent with the fiscal plan approved and certified by the Board. (*Id.* ¶ 98.) The Legislature then passed Act 106-2017 to implement the changes required by the fiscal plan. (*Id.* ¶ 99.) Joint Resolution 188 and Act 106-2017, in accordance with the fiscal plan, liquidated the ERS and diverted its future employer contributions to Puerto Rico's general fund. (*Id.* ¶¶ 95-96, 102.)

Title III of PROMESA incorporated § 552 of the U.S. Bankruptcy Code. 48 U.S.C. § 2161(a). Section 552 provides, in relevant part, that "property acquired . . . by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Before the enactment of PROMESA, § 552 did not apply to the liens granted by the ERS. (ECF 76, ¶ 76.)

In 2017, the Board approved and certified the filing of a PROMESA Title III petition for the ERS. (*Id.* ¶ 85.) Given PROMESA's incorporation of § 552, the ERS's petition raised the issue of whether the plaintiffs' alleged security interest in future employer contributions to the ERS survived the Title III petition. The ERS sought declaratory relief in the United States District Court for the District of Puerto Rico to determine the "'validity, priority, extent and enforceability'" of the plaintiffs' asserted security interest in the ERS's post-petition assets, including employer contributions the ERS would receive post-petition. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 385 F. Supp. 3d 138, 143 (D.P.R. 2019) (quoting D.P.R. Docket Entry No. 40 in Adversary Proceeding No. 17-00213, Ex. B). The district court held: (1) that the plaintiffs' security interest neither fit within the exceptions under § 552 nor were entitled to protection under the "special revenues" provisions of the Bankruptcy Code; and (2) that the plaintiffs could not invoke the canon of constitutional avoidance to avoid the retroactive application of § 552 to their liens. *Id.* at 152, 154-55.

4

On the plaintiffs' appeal, the Court of Appeals for the First Circuit affirmed.  The First Circuit held that: (1) § 552 prevented the plaintiffs' security interest from attaching to post-petition employer contributions; (2) the plaintiffs did not have special revenue bonds under another provision of the Bankruptcy Code; and (3) § 552 applied retroactively to the security agreement.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d 457, 462 (1st Cir. 2020) ("Section 552 Decision"), *cert. denied sub nom. Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*, No. 20-126 (Nov. 16, 2020).

### B.    Procedural History

In 2017, the plaintiffs filed a complaint in this court.  (ECF 1.)  The plaintiffs later amended their complaint, asserting a single claim for just compensation under the fifth amendment for the taking of the Pledged Property.  (ECF 10.)  The plaintiffs claimed that the Board was an instrumentality of the United States government, or, in the alternative, that Puerto Rico had acted under the authority of the federal government.  (*Id.* ¶¶ 83-93.)  The defendant moved to dismiss.

In 2018, Chief Judge Braden held that this court had jurisdiction over the claim, and that the plaintiffs had standing to pursue their claim.  *Altair*, 138 Fed. Cl. 742 (2018).  In so holding, the court found that PROMESA neither withdrew the court's Tucker Act jurisdiction nor preempted the Tucker Act.  The court also found that the Board was a federal entity.  Chief Judge Braden stayed the case, pending decision and final judgment in two separate lawsuits:  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-03283-LTS (D.P.R.) and *Union de Trabajadores de la Industria Electrica y Riego v. Puerto Rico Elec. Power Auth.*, No. 17-228 (D.P.R.).

The case was later reassigned to this judge.  (ECF 51.)  Although the stay had been lifted in the intervening period, this Court again stayed the case pending two appeals in related cases:  *In re Financial Oversight and Management Board for Puerto Rico* in the First Circuit and *Financial Oversight and Management Board for Puerto Rico v. Aurelius Investments, LLC* in the Supreme Court.  (ECF 60 & 70.)  Upon the issuance of decisions in those appeals, the Court lifted the stay in June 2020.  (ECF 71.)

The plaintiffs moved to amend their pleadings for a second time.  (ECF 74.)  In their second amended complaint, the plaintiffs assert three claims.  They seek just compensation under the fifth amendment for the taking of (1) valid and enforceable liens on the Pledged Property and in the contractual right to timely payment of principal and interest by the ERS; (2) valid and enforceable liens on employer contributions as they become owed; and (3) a contractual right to timely payments of principal and interest from employer contributions.  (ECF 76.)

The Court conditionally granted the plaintiffs' motion to amend their pleadings only for administrative purposes to establish the amended complaint as the operative complaint; the defendant remained free to oppose the plaintiffs' motion.  (ECF 78.)

The defendant opposed the plaintiffs' motion to amend their pleadings, arguing the proposed amendment would be futile (*see* footnote 1, *supra*), and moved concurrently to dismiss

the amended complaint and the additional claims of the proposed second amended complaint.[3] (ECF 79.)

In support of its motion to dismiss, the defendant makes five arguments:  (1) the Court lacks jurisdiction over the plaintiffs' takings claim regarding legislation enacted by the government of Puerto Rico, and the independent acts of the government of Puerto Rico cannot be attributed to the United States for takings purposes; (2) the Court lacks jurisdiction because Congress placed exclusive jurisdiction for claims arising under PROMESA in district court, trumping this Court's Tucker Act jurisdiction; (3) the plaintiffs' claims are not ripe for adjudication; (4) the plaintiffs fail to state a claim because the application of Section 552 to their claims did not result in a taking; and (5) the plaintiffs fail to state a claim because the mere frustration of a contractual expectancy is insufficient to establish a taking.

The motions have been fully briefed, and the Court held oral argument on October 29, 2020.

## II.    JURISDICTION

This court derives its jurisdiction from the Tucker Act.  28 U.S.C. § 1491.  The cause of action must be based on a money-mandating source.  *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1306 (Fed. Cir. 2008).  A statute is money-mandating when it is "reasonably amenable to the reading that it mandates a right of recovery in damages."  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003).  "[T]he Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction."  *Jan's Helicopter Serv.*, 525 F.3d at 1309.  The alleged taking must be accreditable to the United States because this court's jurisdiction is limited to "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).

To determine jurisdiction, the "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  The plaintiffs have the burden of establishing jurisdiction by a preponderance of the evidence.  *Id.*

### A.    First Claim

The plaintiffs' first claim seeks just compensation for an alleged taking of their liens on the Pledged Property and of their contractual right to timely payment of principal and interest by the ERS.  This claim targets actions of the Board.  Specifically, the Board, acting under authority granted by PROMESA, designed and approved Joint Resolution 188 and Act 106-2017.  Jointly,

---

[3] The defendant also moved for partial summary judgment, and the plaintiffs opposed that motion.  (ECF 82 & 86.)  Because the Court ultimately grants the defendant's motion to dismiss, the Court denies as moot the defendant's motion for partial summary judgment.

these enactments of the Puerto Rico Legislature, mandated by the Board, had the effect of liquidating the ERS and redirecting future employer contributions to Puerto Rico's general fund. The plaintiffs argue that the Board is a federal entity, or, in the alternative, that Puerto Rico acted under the sovereign authority of the United States. The Court addresses both arguments in turn.

### 1.   Federal Entity

The Court first addresses whether the Board is a federal entity for the purposes of the fifth amendment's takings clause.

In 2018, Chief Judge Braden held in this case that the Board was a federal entity. *Altair*, 138 Fed. Cl. at 760-64. The court noted legislative history referring to the Board as federal but rested its holding on the Supreme Court's decision in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995). Specifically, the court relied on three factors derived from *Lebron* in analyzing whether the Board is a federal instrumentality: (1) whether the Board was created by "special law"; (2) whether the Board was established "for the furtherance of governmental objectives"; and (3) whether the federal government "retain[ed] for itself permanent authority to appoint a majority of the directors." *Id.* at 399. In applying these factors, the court determined that the Board was a federal entity exercising the authority of the United States. Chief Judge Braden did not find that PROMESA's statutory disclaimer—that the Board shall not be considered a federal entity—divested this court of Tucker Act jurisdiction.

Typically, the issue having been decided, this Court would be bound by Chief Judge Braden's earlier ruling under the law-of-the-case doctrine. That doctrine seeks to provide finality of judicial decisions by generally refusing to reopen points of law already resolved in the case. *Gindes v. United States*, 740 F.2d 947, 949 (Fed. Cir. 1984). A court, however, is justified in departing from a previously decided point of law when there has been an intervening change in the law. *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 628 (Fed. Cir. 2015); *see also Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1277-78 (Fed. Cir. 2009) (revisiting an issue after a Supreme Court decision rendered the earlier trial court's takings analysis "obsolete . . . [g]iven the significant change in the law").

Chief Judge Braden made her earlier ruling without the benefit of the Supreme Court's perspective on the status of the Board. Now informed by the *Aurelius* decision, the earlier decision of this court must be revisited.

In *Aurelius*, the Supreme Court considered whether members of the Board were appointed in accordance with the Constitution's appointments clause. 140 S. Ct. 1649. The *Aurelius* Court held that the appointments clause "applies to the appointment of officers of the United States with powers and duties in and in relation to Puerto Rico, but that the congressionally mandated process for selecting members of the [Board] does not violate that Clause." *Id.* at 1665. The basis for the Court's holding was its conclusion that the appointments clause "does not restrict the appointment of local officers that Congress vests with primarily local duties," and that Board members have primarily local duties. *Id.* at 1661-63.

The plaintiffs argue that *Lebron* remains the appropriate precedent because the takings clause, unlike the appointments clause at issue in *Aurelius*, does not distinguish between "territorial" and "federal." According to the plaintiffs, "all government authority [in Puerto Rico] is U.S. government authority ultimately attributable to the United States." (ECF 83 at 17.) *Aurelius*, the plaintiffs conclude, is neither dispositive nor even relevant to the question presented in this case.

The Court disagrees. The plaintiffs' claim must be directed at the federal government to establish Tucker Act jurisdiction. The "federal" versus "local" distinction in *Aurelius* aligns with the Court's required inquiry here. The *Aurelius* Court considered *Lebron* but noted that that case had considered whether Amtrak was a *governmental or a private entity* for purposes of the first amendment. *Aurelius*, 140 S. Ct. at 1663. The question in *Lebron* of whether an entity is governmental "does not answer the 'primarily local versus primarily federal' question." *Id.* at 1664. Because the Court now seeks an answer to the question of whether the Board is a federal or local entity, *Aurelius* is dispositive; it speaks to the precise issue the Court needs to address in order to determine its jurisdiction.

The federal government is not liable for takings of a local government. In *Griggs v. Allegheny Cnty.*, 369 U.S. 84, 89 (1962), for example, the Supreme Court held that the county government, not the federal government, was liable for the taking of an air easement even though the airport that caused the taking was partially federally funded and designed in compliance with federal regulation. Similarly, there is also no taking when the federal government conditions federal funds on a locality's particular action that causes a taking. *B & G Enterprises, Ltd. v. United States*, 220 F.3d 1318, 1323 (Fed. Cir. 2000).

Congress made clear that the Board is an instrumentality of Puerto Rico, not the federal government. PROMESA provided that the Board "shall be created as an entity within the territorial government" and "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." 48 U.S.C. § 2121(c)(1)-(2). Although the statutory disclaimer is not dispositive to determine whether the Board is a local entity (or relatedly whether Congress waived sovereign immunity for the Board's actions), it is informative. *Aurelius* held that Congress "gave the Board a structure, a set of duties, and related powers all of which are consistent with" PROMESA's provision establishing the Board as "'an entity within the territorial government.'" *Aurelius*, 140 S. Ct. at 1661 (quoting 48 U.S.C. § 2121(c)(1)).

Under *Aurelius* the Court must hold that the Board is a local entity, not a federal entity. The plaintiffs' first claim therefore is not against the United States as required under the Tucker Act unless the Board's actions can be attributed to the United States.

## 2.     Federal Authority

The Court next addresses the plaintiffs' argument that the Board's actions can be attributed to the United States because the Board, as an instrumentality of Puerto Rico, acted under federal authority.

The plaintiffs argue that, even if the Board is a local entity, the Board's actions remain those of the federal government for takings-clause purposes. The Board derives its power from Congress pursuant to article IV of the U.S. Constitution. 48 U.S.C. § 2121(b)(2). Relying on the sole-sovereign doctrine derived from *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863 (2016), the plaintiffs argue that all actions of the government of the Commonwealth of Puerto Rico should ultimately be attributed to the United States; there is only one sovereign in the territories, and that sovereign is the federal government.

The Supreme Court in *Sanchez Valle* addressed the issue of whether the prosecutorial powers of the United States and Puerto Rico have independent origins for purposes of the double jeopardy clause of the fifth amendment. In that context, the Court held that the U.S. territories are not sovereigns distinct from the United States. *Id.* at 1873. Because Congress conferred the original source of power for Puerto Rico's prosecutors, Puerto Rico's constitution "does not break the chain" of power. *Id.* at 1875-76. As a result, the Court held that "the Double Jeopardy Clause bars both Puerto Rico and the United States from prosecuting a single person for the same conduct under equivalent criminal laws." *Id.* at 1876.

On its own terms, *Sanchez Valle* does not reach as far as the plaintiffs argue. The holding and the reasoning are expressly limited to the double jeopardy clause. The *Sanchez Valle* Court resolved "a narrow, historically focused question." *Id.* at 1867. It noted that "'sovereignty' in [the double jeopardy clause] context does not bear its ordinary meaning . . . the test we have devised to decide whether two governments are distinct for double jeopardy purposes overtly disregards common indicia of sovereignty." *Id.* at 1870. The Supreme Court made it clear that its reasoning applied only in the specific context of the double jeopardy clause.

The defendant points out that the plaintiffs do not offer any case in which a court has employed an analysis of an entity's ultimate source of sovereignty for purposes of assessing takings liability, and the Court is unaware of any case so holding.[4]

The premise of the plaintiffs' position must be that territories, unlike states, do not enjoy sovereignty in a constitutional sense. When Puerto Rico acts pursuant to authority conferred by Congress, it stands in the same relation to Congress as a municipality stands when it acts under a grant of authority from its state legislature. In this context, the plaintiffs' argument is novel in attempting to hold the ultimate sovereign responsible for acts of local government.

A municipality may be a debtor under chapter 9 only if it "is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a

---

[4] The defendant also argues that the plaintiffs' argument would result in a flood of litigation because there is no workable limiting factor. The limiting factor, as the Court understands it, would be to cases in which a territory is exercising power directly granted by an act of Congress. The Court doubts the defendant's concern would occur, but the potential floodgate problem, no matter how unrealistic, does not arise because the Court rejects the plaintiffs' derivative-liability theory.

governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2). Although there are cases involving takings claims against municipalities for chapter 9 bankruptcies, the Court is unaware of any case in which a creditor has brought a claim against a State for a taking because it had enabled a municipality to file chapter 9 bankruptcy.[5] The plaintiffs have not provided any helpful authority beyond their argument based on *Sanchez Valle*.

The Supreme Court has determined that in establishing the organic laws of Puerto Rico, "[t]he purpose of Congress . . . was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union . . . ." *Bd. of Eng'rs, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 594 (1976) (citing *Calero-Toledo v. Pearson Yacht Leasing*, 416 U.S. 663, 671 (1974)). The Court held in *Calero-Toledo* that Puerto Rico could not take property without due process. *Calero-Toledo*, 416 U.S. at 689. More to the point, the Supreme Court acknowledged just two years later that the source of the prohibition on takings by Puerto Rico had not been determined: it could be either the fourteenth amendment, as applied to the States, or the fifth amendment, applicable directly to the federal government. *Flores de Otero*, 426 U.S. at 601; *see also Posadas de Puerto Rico Assoc. v. Compania de Turismo*, 478 U.S. 328 (1986). This unresolved question is at the heart of the dispute before this Court. If the prohibition on takings applies to Puerto Rico through the fifth amendment directly, then Puerto Rico may be said to be exercising authority attributable to the sovereignty of the United States; if the prohibition applies to Puerto Rico by virtue of the fourteenth amendment, then Puerto Rico stands effectively in the same position as the States.

The First Circuit has assumed that the takings clause of the fifth amendment applies to Puerto Rico, but it also has not identified whether it applies directly or through the fourteenth amendment. *See Deniz v. Mun. of Guaynabo*, 285 F.3d 142, 146 (1st Cir. 2002); *Tenoco Oil Co., Inc. v. Dep't of Consumer Affs.*, 876 F.2d 1013, 1017 n.9 (1st Cir. 1989); *Culebras Enters. Corp. v. Rivers Rios*, 813 F.2d 506 (1st Cir. 1987).

District courts in Puerto Rico have found the takings clause applicable through the fourteenth amendment, albeit without analysis. *See Sistemas Urbanos, Inc. v. Lugo Ramos*, 413 F. Supp. 2d 96 (D.P.R. 2006); *U.S. Fire Ins. Co. v. Corp. Insular de Seguros*, 853 F. Supp. 47 (D.P.R. 1994). It has similarly been held that a takings claim against Puerto Rico may be brought under 42 U.S.C. § 1983, the statute authorizing suit against States and territories, but not

---

[5] Two relevant cases analyze the takings clause in claims against a municipality in the chapter 9 context. *See In re City of Stockton*, 909 F.3d 1256, 1266 (9th Cir. 2018) (analyzing whether the city's chapter 9 petition violated the takings clause and holding that "[t]he Takings Clause is only implicated in bankruptcy if the creditor has actual property rights."); *In re City of Detroit*, 524 B.R. 147 (Bankr. E.D. Mich. 2014) (analyzing whether the city's chapter 9 plan violated the takings clause and finding that a taking had occurred). In neither case was a claim for a taking instituted against the State that had authorized each municipality to seek protection from its creditors under chapter 9 of the Bankruptcy Code or, due to the eleventh amendment, against a state official or instrumentality.

the United States, for violations of civil and constitutional rights.  *See, e.g., Redondo Borges v. U.S. Dep't of Housing & Urban Dev.*, 421 F.3d 1, 7 (1st Cir. 2005); *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995); *Deniz*, 285 F.3d at 145-46; *see also* 42 U.S.C. § 1983 (creating a cause of action for constitutional violations, including takings-clause violations, "under color of any statute . . . of any State or Territory or the District of Columbia.").

It is also not enough to argue that the critical distinction in PROMESA is that Congress enacted the law directly and imposed it on Puerto Rico, something Congress could not do to a State.  In dealing with a State confronting financial issues like Puerto Rico's, Congress could not legislate directly but could grant benefits or impose restrictions on a State to compel it to undertake the same kinds of things that Congress imposed directly on Puerto Rico.  And granting or withholding benefits to a State to compel a course of conduct is constitutional.  *South Dakota v. Dole*, 483 U.S. 203 (1987).

Because the Court finds no precedential basis to attribute the Board's actions to the United States, the Court rejects the plaintiffs' novel theory of derivative liability.  Instead of precedent, the plaintiffs rely on a theory of sovereignty that is one-dimensional and categorical, viewing the concept of sovereignty as indivisible.  A modern rendering of sovereignty is more capacious, nuanced, and flexible than the plaintiffs' theory would have it.  That theory must yield to the reality of the place of Puerto Rico as a commonwealth under the United States Constitution.  Congress intended that Puerto Rico enjoy "the degree of autonomy and independence normally associated with [the] States."  *Flores v. Otero*, 426 U.S. at 594.  From this perspective, the Court finds that the takings clause of the fifth amendment applies to Puerto Rico through the fourteenth amendment.  The acts of the Board are not attributable, directly or indirectly, to the United States in a manner needed to sustain liability under the fifth amendment for an alleged taking.[6]  The plaintiffs have failed to establish that the Court has jurisdiction over their first claim.

Instead, the acts of the Board are acts of Puerto Rico, as Congress expressly directed in PROMESA.  *See* 48 U.S.C. § 2121(c)(1)-(2).  The Court of Claims, whose decisions are binding on this Court, held that "if Congress explicitly severed all governmental nexus with an instrumentality it created, then there would be no jurisdiction in this court over actions brought against that instrumentality."  *Green v. United States*, 229 Ct. Cl. 812, 813-14 (1982) (citing *Butz Eng'g Corp. v. United States*, 204 Ct. Cl. 561, 499 F.2d 619 (1974), *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011)); a*ccord Slattery*, 635 F.3d at 1307 n.3 ("The Tucker Act is not available when the breaching entity is not part of the federal government or not acting as its agent, or when jurisdiction has been explicitly disclaimed.").

---

[6] The District of Columbia, which stands in a similar relationship with the federal government as Puerto Rico, has similarly been held not to be an agency or instrumentality of the United States under the Tucker Act.  *Yates v. United States*, 225 Ct. Cl. 604, 605 (1980); *Fernandez v. United States*, 12 Cl. Ct. 764, 767 (1987).

Any liability for a taking, if one has occurred, must rest with Puerto Rico pursuant to § 1983.  Indeed, the plaintiffs are pursuing takings claims in the District of Puerto Rico.  *See* ERS Bondholders' Supplement to Proofs of Claim at 23-28, *In re Fin. Oversight & Mgmt. Bd. for P.R.,* Nos. 17-03283 & 17-03566 (D.P.R.) (filed Mar. 25, 2020) (*available at* ECF 79, App. 119-24.).

If the plaintiffs are to succeed on their takings claim, they will have to do so in the District of Puerto Rico because this Court has no jurisdiction over the plaintiffs' taking claim under the Tucker Act.

### B.    Second and Third Claims

The plaintiffs' second claim seeks just compensation for an alleged taking of their liens on post-petition employer contributions to the ERS, and their third claim seeks just compensation for an alleged taking of a contractual right to timely payments of principal and interest from post-petition employer contributions to the ERS.

The second and third claims target federal action (the enactment of PROMESA), so these claims do not raise the local-versus-federal issue that the plaintiffs' first claim does, and the defendant does not challenge this Court's jurisdiction over these claims on the same basis.

Instead, the defendant argues that Congress withdrew this Court's Tucker Act jurisdiction in PROMESA and directed all suits under the law to the district court.  Chief Judge Braden already rejected the defendant's argument to that effect.  *Altair*, 138 Fed. Cl. at 754-60.  With no intervening decision of a higher court or a change in the law, the Court declines to re-examine whether PROMESA withdrew or preempted Tucker Act jurisdiction.  Under the law-of-the-case doctrine, the Court will not revisit Chief Judge Braden's earlier decision and will exercise jurisdiction over the plaintiffs' second and third claims.

## III.    FAILURE TO STATE A CLAIM[7]

The defendant has moved to dismiss the second and third claims of the second amended complaint for failure to state a claim under RCFC 12(b)(6).  Dismissal for failure to state a claim upon which relief can be granted "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  In evaluating a motion to dismiss for failure to state a claim, the court must accept as true a complaint's well-pleaded factual allegations and construe them in the most favorable manner to the plaintiff.  *Ashcroft v. Iqbal*, 566 U.S. 662, 668 (2009).  The court must draw all reasonable

---

[7] The defendant argues that the plaintiffs' second and third claims are not ripe because they are still litigating the value of their bonds in other courts.  The Court agrees with the plaintiffs that their second and third claims are based on the retroactive application of § 552, and the separate, ongoing litigation only affects the extent of damages.  The claims are ripe, and the Court proceeds to consider the other grounds urged by the defendant for dismissal.

inferences in favor of the non-moving party.  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).

To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiff is entitled to the relief sought.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 556).

The Court next assesses the plaintiffs' second and third claims under this standard.  Both fail and must be dismissed.

### A.      Second Claim:  Liens on Post-Petition Employer Contributions

The plaintiffs' second claim seeks just compensation for an alleged taking of their liens on employer contributions as they become owed.  The Court considers whether the plaintiffs had a property interest in those post-petition employer contributions.  If the plaintiffs had no property interest, they could not have suffered a taking.

Only plaintiffs with a valid property interest at the time of a taking are entitled to compensation.  *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001).  The fifth amendment does not create property interests; instead, property interests stem from independent sources of law, typically state law.  *Philips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

### 1.      First Circuit's Section 552 Decision

The First Circuit recently considered whether the plaintiffs had valid and enforceable liens in post-petition employer contributions and held that they did not.  *Section 552 Decision*, 948 F.3d at 468.  To the First Circuit the plaintiffs had argued, *inter alia*, that the ERS's statutory right to employer contributions was a property right, and that the plaintiffs had a security interest in the ERS's right to receive those contributions.[8]  *Id.* at 466.

The First Circuit concluded, in relevant part, that because "the payment and the amounts of Contributions depended on work occurring on and after the petition date," the ERS's statutory authority to receive post-petition employer contributions was merely an expectancy, not a property right under Puerto Rican law.  *Id.* at 468.  As a result, the plaintiffs "did not have a prepetition property right in any post-petition contributions that might be made.  At most, the [plaintiffs] had an expectation."  *Id.*  Having found that the plaintiffs had no property interest, the First Circuit noted that "[i]t is impossible to have a lien on something that does not exist."  *Id.*  at 472.

_____

[8] The First Circuit used "lien" and "security interest" interchangeably.  *Section 552 Decision*, 948 F.3d at 463 n.1.

Both the bond resolution and the official statement for the bonds put the plaintiffs on notice that Puerto Rico might reduce, "or, by implication, eliminate" employer contributions.[9] *Id.* at 468-69; *see also* (ECF 76, Ex. A at VI-16 (noting that the ERS would oppose legislative changes that "may adversely affect the ability of [the ERS] to comply with its obligations").) The First Circuit also held that § 552 applied retroactively to the security agreement. *Section 552 Decision*, 948 F.3d at 475-77.

The plaintiffs concede in their second amended complaint that the First Circuit has held that their liens do not extend to employer contributions that become owed to the ERS after the Title III petition was filed. (ECF 76, ¶ 53.) The plaintiffs argue that if they do not have enforceable liens, then Congress took the plaintiffs' property rights by retroactively applying § 552 to security interests and agreements created before the enactment of PROMESA. (*Id.* ¶¶ 53, 77.)

The First Circuit, however, did not merely hold that the liens did not extend to post-petition employer contributions; it also held that the plaintiffs do not have a property interest in those contributions because the contributions were a mere "expectation." *Section 552 Decision*, 948 F.3d at 468. Section 552 did not destroy the plaintiffs' property interest because they had no property interest to destroy. Without that interest, the plaintiffs cannot show that a taking occurred when PROMESA retroactively applied § 552.

## 2.     Collateral Estoppel

The parties dispute the impact of the First Circuit's decision on this case. The defendant argues that the plaintiffs are collaterally estopped from pursuing their second claim here because they already litigated the identical issue before the district court and the First Circuit and lost. The plaintiffs attempt to distinguish the issue decided by the First Circuit from that before this Court.

Under the collateral-estoppel doctrine, "once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984). The Supreme Court has abandoned the requirement of mutuality of parties but only for the offensive (plaintiff invoked) use of the doctrine by a non-party to a prior lawsuit. *Id.* at 158-59. Defensive use, when, as here, the defendant seeks to prevent a plaintiff from relitigating an issue, still requires the mutuality of parties in order for collateral estoppel to be

---

[9] The bond resolution governs the contractual relationship between the ERS and the plaintiffs with respect to the ERS bonds. (ECF 76, Ex. A.) The official statement accompanied the bonds. *See Section 552 Decision*, 948 F.3d at 468-69.

applied. *Id.* The defendant therefore can only invoke collateral estoppel against those parties who litigated the issue before the district court or the First Circuit.[10]

Collateral estoppel has four elements: "(1) the issues are identical to those in a prior proceeding, (2) the issues were actually litigated, (3) the determination of the issues was necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001).[11]

The first element of collateral estoppel is met. The issue before the Court is identical to the one resolved by the First Circuit. The plaintiffs' second claim here seeks to establish a taking of "valid and enforceable liens on employer contributions as they become owed." (ECF 76, ¶ 118.) The First Circuit sought to determine the validity and enforceability of those liens. *Section 552 Decision*, 948 F.3d at 462. As discussed above, the First Circuit found that there could be no lien on the mere expectation of contributions. *Id.* at 468.

According to the plaintiffs, the First Circuit did not consider whether they had an "independent property right for purposes of a takings claim." (ECF 83 at 39.) The First Circuit, though, did consider local law, which is the source of any property right. *Section 552 Decision*, 948 F.3d at 468 n.8. Because the fifth amendment does not create property rights, there is no "independent property right" for the takings-clause analysis. *Philips*, 524 U.S. at 164.

The plaintiffs also argue that the First Circuit decided only that employer contributions were not the ERS's property. The holding was not so limited; the First Circuit expressly held that the plaintiffs do not have a property interest in post-petition employer contributions. *Section 552 Decision*, 948 F.3d at 468.

---

[10] It appears that the following parties to this case also participated in the section 552 litigation: Altair Global Credit Opportunities Fund (A), LLC; Andalusian Global Designated Activity Company; Glendon Opportunities Fund, LP; Mason Capital Master Fund LP; Nokota Capital Master Fund, L.P.; Oaktree Opportunities Fund IX (Parallel 2), L.P.; Oaktree Value Opportunities Fund, L.P.; Oaktree-Forrest Multi-Strategy, L.L.C. (Series B); Ocher Rose, L.L.C.; and SV Credit, L.P. Parties to the present action who did not litigate the Section 552 case appear to be the following plaintiffs: Crown Managed Accounts for and on behalf of Crown/PW SP; LMA SPC for and on behalf of Map 98 Segregated Portfolio; Oceana Master Fund Ltd.; Pentwater Merger Arbitrage Master Fund Ltd.; PWCM Master Fund Ltd. These parties did not previously litigate this claim, and collateral estoppel may not be applied against them in this case. Discussion as to the merits follows, *infra*, at 16-17.

[11] The Court applies Federal Circuit collateral-estoppel precedent. The First Circuit's collateral-estoppel precedent would reach the same result under a similar test. *Compare Daniels v. Agin*, 736 F.3d 70, 87-88 (1st Cir. 2013), *with Banner*, 238 F.3d at 1354.

The second, third, and fourth elements of collateral estoppel are also met.  The issue—whether the plaintiffs had a property interest in post-petition employer contributions—was litigated and resolved.  That issue was necessary to the resulting judgment because the absence of a property interest was the basis for finding that the plaintiffs' alleged lien did not fall into the "proceeds" exception in § 552.  Finally, the plaintiffs had a full and fair opportunity to litigate the issue.  They fully briefed and argued the issue before the district court and the First Circuit.

Collateral estoppel therefore bars the plaintiffs from raising in this case their claim that they had a property interest in post-petition employer contributions.

This holding is consistent with Federal Circuit precedent.  In *Banner*, the Federal Circuit upheld a decision of this court applying the collateral-estoppel doctrine in a takings-clause case.  238 F.3d at 1355.  The appellants in that case argued that they had a property right to renew leases in land.  *Id.* at 1352.  The Second Circuit had held otherwise.  *Id.*  In applying collateral estoppel, the Federal Circuit in *Banner* held that the appellants did not have a compensable property interest in the right to renew or negotiate their leases; indeed, "[w]ithout a property interest, there can be no taking within the meaning of the Fifth Amendment."  *Id.* at 1356.

### 3.     No Property Interest

As noted above (*see* footnote 10, *supra*), there are several plaintiffs in this case who were not a party to the appeal in the First Circuit and cannot be collaterally estopped from raising the property-interest issue.  For those plaintiffs to which collateral estoppel does not apply, however, the Court determines, based on its own independent analysis, that the plaintiffs do not have a valid property interest in their liens.

The question of whether the ERS had a property interest is not before the Court, but in its *Section 552 Decision* the First Circuit held that the ERS did not have a property interest in post-petition contributions.  Puerto Rico created the ERS through Act No. 447 of May 15, 1951.  (ECF 76, ¶ 32.); *see also* 3 L.P.R.A. § 761.  Before an amendment in 2011, the ERS's board of trustees had the authority to incur debt on behalf of the ERS and to secure that debt with the ERS's assets.  3 L.P.R.A. § 779(d) (1999).  Before legislative changes in 2017, the ERS had a statutory right to employer contributions, which made up the largest component of its income stream.  (ECF 76, ¶ 33.)  The First Circuit held that, under the statutory scheme, the ERS's right was limited to those contributions that were determinable.  948 F.3d at 467-68.  Hence, the ERS had no property right in those contributions not fixed and calculable at the time of bankruptcy; the post-petition employer contributions were merely an expectancy.[12]  *Id.* at 468.

The First Circuit's determination is central to answering the question of whether the plaintiffs had a property interest in their liens.  Employer contributions were included in the Pledged Property as part of the security package in the bond resolution.  At the time of the Title

---

[12] The First Circuit considered local law in its reasoning and found that Puerto Rico does not recognize a property interest in a mere expectancy.  *Section 552 Decision*, 948 F.3d at 468 n.8.

III petition, however, the ERS did not have a property interest in future employer contributions because the contributions were undetermined. The plaintiffs argue that they had a lien on the ERS's expectancy, and that a lien, even on a mere hope, is a property interest. Not so.

A lien can be a property interest. For example, in *Armstrong v. United States*, 364 U.S. 40, 48 (1960), the Supreme Court found a fifth amendment taking when the government destroyed all the value of the petitioners' liens. The petitioners had materialmen's liens under state law for construction materials furnished to Rice Shipbuilding Corporation, which was building boats for the United States. *Id.* at 41. When Rice defaulted on its contract with the United States, the United States obtained title to all of Rice's construction materials, rendering the petitioners' liens unenforceable. *Id.* Because the petitioners had valid and compensable liens prior to the government's action and none afterwards, the Supreme Court found that the government had taken the petitioners' property. *Id.* at 48-49.

*Armstrong* is different from this case in one important aspect. In *Armstrong*, the petitioners had furnished the construction materials to Rice, which acquired a property interest in those materials. In this case, however, the ERS, unlike Rice, never acquired a property interest in the post-petition employer contributions because the ERS had a statutory right only to the contributions determinable at the time of the Title III petition. This case, in contrast to *Armstrong*, involves a lien on the ERS's expectation, not, as the First Circuit held, on its property.

A lien must operate upon an identified property interest. *See Sims v. Jamison*, 67 F.2d 409, 411 (9th Cir. 1933) ("It is needless to say that there can be no lien upon what does not exist."); *cf. Local Loan Co. v. Hunt*, 292 U.S. 234, 243 (1934) ("it logically cannot be supposed that the [bankruptcy provision at issue] . . . intended to keep . . . debts alive for the purpose of permitting the creation of an enforceable lien upon a subject not existent when the bankruptcy became effective . . . ."). The Bankruptcy Code likewise defines the term "lien" to mean "charge against or interest in *property* to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37) (emphasis added). In a related context, the Supreme Court described its lien-takings cases in a similar way: "In this case . . . the monetary obligation burdened petitioner's ownership of a specific parcel of land. In that sense, this case bears resemblance to our cases holding that the government must pay just compensation when it takes a lien—a right to receive money that is secured by a *particular piece of property*." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 613 (2013) (emphasis added).

Because the ERS did not have a property interest in post-petition employer contributions, the plaintiffs could not have had a valid and enforceable lien against those contributions at the time of the ERS's Title III petition.

Under either the collateral-estoppel doctrine or the Court's independent reasoning, the conclusion is the same: the plaintiffs did not have a property interest in their purported liens on post-petition employer contributions. Accordingly, the plaintiffs cannot establish a taking and have failed to state a claim upon which relief can be granted.

**B.     Third Claim:  Contractual Right to Post-Petition Employer Contributions**

The plaintiffs' third claim seeks just compensation for an alleged taking of a contractual right to timely payments of principal and interest from post-petition employer contributions to the ERS.  The Court considers whether PROMESA took the plaintiffs' contractual right pursuant to the statute's incorporation of § 552 of the Bankruptcy Code.

The First Circuit's decision provides the basis of the plaintiffs' third claim.  The plaintiffs argue that § 552, as construed by the First Circuit, destroyed the plaintiffs' contractual right to be paid from employer contributions.  According to the plaintiffs, § 552 ensured that such funds would be redirected away from the plaintiffs, thus rendering the plaintiffs' contractual rights to payment unenforceable.  (ECF 76, ¶ 126.)  Section 552's impairment of their contractual right, the plaintiffs argue, was therefore a taking under the fifth amendment.

Section 552 impaired the plaintiffs' contractual right to post-petition employer contributions, but this impairment does not constitute a taking under the fifth amendment.  Accordingly, the plaintiffs fail to state a claim upon which relief can be granted.

**1.     Impaired Contract**

Valid contracts are property and can be the subject of a takings action.  *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1365 (Fed. Cir. 2009).  Generally, however, "the government does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights."  *Id.*

The Federal Circuit in *Palmyra* applied the framework set out by the Supreme Court in *Omnia Com. Co. v. United States*, 261 U.S. 502 (1923).  In *Omnia*, the petitioner had a contract with Allegheny Steel Company to purchase a large quantity of steel plate at a below-market price.  *Id.* at 507.  The United States then requisitioned the steel company's entire production of steel plate.  *Id.*  Omnia brought a claim for an alleged taking of its contract, and the Supreme Court held that there had been no taking.  *Id.* at 511.

As interpreted by the Federal Circuit, *Omnia* "made clear that . . . courts should distinguish between the claimed taking of the subject matter of a contract and the taking of the contract itself, and it held that a showing that the subject matter of a contract has been taken is not sufficient to demonstrate that the contract itself has been taken."  *Palmyra*, 561 F.3d at 1365; *see also Omnia*, 261 U.S. at 511 ("Parties and a subject-matter are necessary to the existence of a contract, but neither constitutes any part of it; the contract consists in the agreement and obligation to perform.").  In *Omnia*, the government did not take the contract; it took the subject matter underlying the contract, *i.e.*, the steel.  *Omnia*, 261 U.S. at 511.

In *Palmyra*, the plaintiff had acquired by contract a commercial fishing license to fish in the waters around Palmyra Atoll in the Pacific Ocean.  561 F.3d at 1363.  Later, the Department of the Interior promulgated a regulation restricting commercial fishing in the area.  *Id.* at 1364.  Applying the *Omnia* framework, the Federal Circuit held that the plaintiffs had no protectable

property interest in the regulated conduct, and that as a result no compensable taking had occurred. *Id.* at 1370.

In this case, the plaintiffs had a contract for future employer contributions owed to the ERS. Those contributions are no longer available to the plaintiffs because the Board filed the ERS's Title III petition pursuant to the authority of PROMESA, which applied § 552 retroactively. As occurred in *Palmyra*, the government here regulated property in which the plaintiffs did not have a protectable property interest. The bonds were not taken by the Title III petition or by the underlying statutory authority enacted by Congress; instead, their value was diminished. This "impairment," as the plaintiffs phrased it in their complaint (ECF 76, ¶ 127), is insufficient to support a claim for a taking. At most, § 552 took some subject matter of the contract (future employer contributions), not the contract itself.

The plaintiffs rely on their derivative-liability theory—rejected by the Court (*see* Section II.A.2, *supra*, at 8-12)—to distinguish *Palmyra*. They rely on *Sanchez Valle* to argue that the contract, the plaintiffs' property, is not between two private parties, but between the plaintiffs and the United States. They reason that the ERS is an instrumentality of Puerto Rico, which under the plaintiffs' theory of derivative liability, must stand in the shoes of and be considered the United States as the sole sovereign.

As previously discussed, the Court does not give to *Sanchez Valle* the reach that the plaintiffs propose. That case was limited to the peculiar effects of the double jeopardy clause. The Court has already rejected the plaintiffs' argument that the United States is liable for the actions of Puerto Rico. Having rejected that argument in the context of the plaintiffs' first claim, the Court will not revive it to support the plaintiffs' third claim. The United States is not a party to the contract, and *Palmyra* applies.

The Court's conclusion that the plaintiffs' contract was not taken is reinforced by the fact that the plaintiffs may seek to enforce their rights under the contract through a breach of contract action in the Title III forum. In *Piszel v. United* States, 833 F.3d 1366, 1377 (Fed. Cir. 2016), the Federal Circuit rejected a takings claim when the plaintiff was left with the ability to enforce his contract in a breach-of-contract action.

The plaintiffs argue that a breach-of-contract remedy is inadequate in their situation because it would not ensure just compensation, whereas *Piszel* involved a solvent defendant from which the full amount of damages could be recovered. This argument misses the point. The measure of damages is not the determinative feature. The plaintiffs retain the ability to enforce their contracts against the ERS and may be awarded damages. It is not for this Court, or the plaintiffs in the context of this action, to presume the amount of an award in their claim to enforce their contracts. The plaintiffs claim entitlement to the full value of their contracts; in the absence of the Title III action, however, what would the value of those contracts have been in case of insolvency of Puerto Rico and of the ERS? There is no reason to presuppose at this stage of any proceeding what the value of the plaintiffs' recoverable claim under their contracts would be. The existence of the legal claim to enforce their contract rights obviates their taking claim under *Piszel*; the damages issue cannot change that fact because it cannot be known whether the ERS will be able to meet an obligation to pay damages awarded in the case to enforce the

plaintiffs' contract rights. This problem with the plaintiffs' claim underlies the defendant's ripeness defense; the Court has rejected that defense because the plaintiff's claim is for the retroactive application of § 552 as enacted by PROMESA. Under *Piszel,* however, the damages issue undercuts the plaintiffs' claim on the merits.

### 2.     Plaintiffs' Additional Theories

Having failed to distinguish *Palmyra* and *Piszel*, the plaintiffs present additional theories to attempt to establish a taking of their contractual right in this case. They point to three situations that constitute a taking and argue that each has occurred under PROMESA: (1) the government action expressly targets an existing contract right; (2) the government takes over the contract right; and (3) the government blocks bargained-for consideration after one party has performed.

First, the plaintiffs rely on *Cienega Gardens v. United States* for the proposition that there is a taking when the government expressly targets an existing contract right. *See* 331 F.3d 1319 (Fed. Cir. 2003). *Cienega Gardens* involved a takings claim by real-estate developers who entered into a federal program to build housing. *Id.* at 1325. The developers used federally guaranteed mortgage loans that placed restrictions on the developers' ownership for as long as the contract of mortgage insurance remained in effect. *Id.* They had a right to prepay their 40-year mortgages after 20 years. *Id.* Because many developers were planning to prepay and remove their properties from the program, Congress passed new legislation to prohibit prepayment. *Id.* at 1326. The Federal Circuit found, *inter alia*, that the developers had a vested property interest in their contractual rights, and the enactment of the legislation took that interest in violation of the fifth amendment. *Id.* at 1353.

The plaintiffs argue that *Cienega Gardens* applies to their third claim because the retroactive application of § 552 directly and intentionally abrogated the plaintiffs' contract right to payment on post-petition employer contributions. According to the plaintiffs, the whole point of applying § 552 was to enable the redirection of the funds derived from post-petition employer contributions in support of Congress' goal of providing a method for Puerto Rico to achieve fiscal responsibility and access to the capital markets.

*Cienega Gardens* does not apply here. That case involved a property interest in "real property rights to sole and exclusive possession after twenty years and to convey or encumber their properties after twenty years." *Id.* at 1329. The property interest therefore was "based on the interaction of both real property rights and contractual rights." *Id.* As interpreted by *Palmyra*, the court in *Cienega Gardens* viewed the government action "as having appropriated a real property right that the developers enjoyed before the legislation but not afterwards." *Palmyra*, 561 F.3d at 1368.

In this case, however, the plaintiffs did not have a property interest in post-petition employer contributions. Therefore, PROMESA did not alter the plaintiffs' contract right in a way that affects their underlying property interest, which was non-existent, and, *a fortiori*, *Cienega Gardens* does not apply.

Second, the plaintiffs rely on *Brooks-Scanlon. v. United States*, 265 U.S. 106 (1924), to argue that a taking occurs when the government takes over a contract right.  In contrast to *Omnia*, under *Brooks-Scanlon*, a taking arises when the government takes over the contract itself, not the subject matter.  In *Brooks-Scanlon*, the United States took over a contract to build a ship.  *Id.* at 120 ("By its orders it put itself in the shoes of claimant and took from claimant and appropriated to the use of the United States all the rights and advantages that an assignee of the contract would have had.").  The plaintiffs argue that in this case the post-petition employer contributions payable to them as bondholders went unencumbered to Puerto Rico and, by extension, the United States.  This argument again relies on the plaintiffs' theory of derivative liability, already rejected by the Court.  Without being able to avail themselves of their derivative-liability theory, the plaintiffs are unable to reap any benefit from a showing that the benefit under the contract was transferred to Puerto Rico, because that showing does nothing to connect the United States with the post-petition employer contributions or the plaintiffs' asserted contractual right to them.

Third, the plaintiffs argue that the retroactive application of § 552 by the Title III court extinguished their bargained-for consideration—namely, the right to repayment from all employer contributions paid to the ERS, in exchange for providing approximately $3 billion they invested in the ERS bonds to enable the ERS to meet its obligation to pay employee pensions.  The plaintiffs latch on to a single phrase from *Chang v. United States*, 859 F.2d 893, 898 (Fed. Cir. 1988) for the proposition that "a taking may occur where the government imposes a condition or consequence on a contract that 'result[s] in a loss of income for services previously provided but not yet paid for.'"  (ECF 83 at 46.)

The plaintiffs' reliance on *Chang* is misplaced.  The phrase that the plaintiffs quote was not the Federal Circuit's holding in *Chang*; instead, the plaintiffs plucked the phrase from a portion of the opinion in which the Federal Circuit explained that the plaintiffs in *Chang* were *not* claiming loss of income for services already performed.  *Chang*, 859 F.2d at 898 ("the plaintiffs *do not* complain that the sanctions resulted in a loss of income for services previously provided but not yet paid for." (emphasis added)).  Instead, the plaintiffs in *Chang* sought compensation for the loss of the contingent right to future income for services yet to be rendered.  *Id.*  The plaintiffs' citation to the Federal Circuit's phrasing in *Chang* is not relevant.

In reviewing a motion to dismiss from this court, the Federal Circuit in *Chang* determined that there had not been a compensable taking of a contractual right under the fifth amendment after weighing the relevant factors established by *Penn Cent. Transp. Co. v. City of New* York, 438 U.S. 104, 124 (1978).  *Chang,* 859 F.2d at 895-96.  Upon failing that test, the Federal Circuit in *Chang* dismissed the plaintiffs' complaint for failure to state a claim upon which relief could be granted.  *Id.*

Under *Penn Central*, courts weigh three factors of "particular significance" to determine whether there has been a regulatory taking:  (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."  *Penn Cent. Transp. Co.*, 438 U.S. at 124.

The plaintiffs argue that each *Penn Central* factor turns in their favor.[13]  First, the effect of eliminating the plaintiffs' contract right had a "devastating economic impact on the value of the bonds because it eliminates what was intended to be the primary source of their repayment." (ECF 83 at 49.)  Second, the United States interfered with their investment-backed expectations because, even though the bond resolution contemplated that future payments were contingent on Puerto Rico's fiscal status, the plaintiffs had no reason to think Congress would affect the value of the bonds.  Finally, the United States acted to ensure that the employer contributions were redirected elsewhere, not in pursuit of some unrelated regulatory goal.

The Court finds that the *Penn Central* factors, even if relevant, weigh against finding a taking in this case.

First, the plaintiffs can show some economic impact, but the extent is uncertain.  PROMESA's retroactive application of § 552 did effectively cut off their ability to receive the benefit of post-petition employer contributions as they become owed to the ERS.  As the Court discussed earlier, those contributions were merely an expectancy.  Instead of being similar to a loss of income for services previously provided but not yet paid for, as the plaintiffs contend, the plaintiffs' contractual right to future employer contributions is more like the contingent right to future income at issue in *Chang*.  *See* 859 F.2d at 898.  "Such future damages," the Federal Circuit held, "are speculative and merely consequential to the valid exercise of governmental power."  *Id.*  The plaintiffs did perform on the contract in the sense that they paid for the bonds, but the bonds still exist.  The plaintiffs are still litigating the value of those bonds.

Second, the plaintiffs cannot show that the United States interfered with investment-backed expectations.  "The critical question is whether extension of existing law could be foreseen as reasonably possible."  *Cienega Gardens v. United States*, 503 F.3d 1266, 1288-89 (Fed. Cir. 2007).  Puerto Rico, like the states, could authorize its municipalities to obtain federal municipal bankruptcy relief at least from 1938 until 1984.  *Franklin California Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322, 329-30 (1st Cir. 2015).  When the bonds were issued in 2008, however, Puerto Rico and its instrumentalities had not enjoyed access to bankruptcy for almost 25 years.  Puerto Rico's fiscal situation became increasingly precarious.  Ultimately, as a result of its worsening financial situation, Puerto Rico was again provided access to relief through provisions of the Bankruptcy Code under PROMESA.  *See* 48 U.S.C. §§ 2161(a) & 2194(m).

The risk of a potential bankruptcy was in fact foreseen in 2008.  Going directly to the point, the bond resolution from 2008 for the ERS bonds at issue warned that the bonds' enforceability "may be limited by *bankruptcy*, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore *or thereafter enacted . . . .*" (ECF 76, Ex. A at VI-3 (emphasis added).)  Even though there was no applicable bankruptcy law at the time, the issuer thought it necessary to include the warning.  Thus, investors in the bonds were warned

---

[13] The Court addresses the *Penn Central* factors applied in *Chang* because the plaintiffs have pursued the argument.  Given that the Court finds *Palmyra* and *Piszel* controlling, the Court's analysis is not necessary to its decision.

specifically that bankruptcy was a possibility.  Such a possibility may have seemed unlikely in 2008, but it was not unforeseen.

Finally, the nature of the governmental action challenged in this case weighs against the plaintiffs.  In analyzing the nature of governmental action, the Federal Circuit in *Chang* considered whether the government had procured the contract for itself, and *Chang* balanced the governmental interests against any remaining use of the property.  *Chang*, 859 F.2d at 896-97.  Here, the United States did not procure the plaintiffs' contract right to post-petition employer contributions at all, and certainly not for itself.  Instead, it merely enabled Puerto Rico to seek relief under the Bankruptcy Code.  The decision to put the plaintiffs' income at risk was made by an instrumentality of Puerto Rico, the Board, and adopted by Puerto Rico's Legislature.

In enacting PROMESA, Congress substantially advanced a legitimate governmental interest, *i.e.*, to mitigate the "fiscal emergency" facing Puerto Rico.  *See* 48 U.S.C. § 2194(m).  In so doing, the plaintiffs retained the ability to seek enforcement of their rights under the contract through a breach of contract action in the Title III forum.

In sum, the plaintiffs' additional theories do not establish a taking of their contract right to post-petition employer contributions sufficient to state a claim.

## IV.   CONCLUSION

The Board is not a federal entity, and its actions cannot legally be attributed to the federal government.  This Court has jurisdiction only over claims against the United States.  Because the actions of the Board are not those of the United States, the Court lacks subject-matter jurisdiction over the plaintiffs' first claim and therefore dismisses it under RCFC 12(b)(1) and 12(h)(3).

The plaintiffs did not have a property interest in post-petition employer contributions, and the impairment of the plaintiffs' contractual rights is insufficient to constitute a taking.  Accordingly, the Court dismisses the plaintiffs' second and third claims for failure to state a claim upon which relief can be granted under RCFC 12(b)(6).

The Court denies as moot the defendant's motion for partial summary judgment.

The Court will issue an order in accordance with this memorandum opinion.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**